291 F.3d 586
 United States of America, Plaintiff-Appellee,
v.
Jared C. Beckman, Defendant-Appellant.
 No. 01-50288.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted April 5, 2002 — Pasadena, California.
 Filed May 21, 2002.
 
 COPYRIGHT MATERIAL OMITTED J. Michael Roake (argued), Roake & Roake, San Diego, California, for the defendant-appellant.
 Patrick K. O'Toole, United States Attorney, Pennie M. Carlos (on the brief), Assistant United States Attorney, Scott H. Saham (argued), Assistant United States Attorney, U.S. Attorney's Office, San Diego, California, for the plaintiff-appellee.
 Before: Michael Daly Hawkins and Raymond C. Fisher, Circuit Judges, and Charles R. Weiner,* District Judge.
 OPINION
 HAWKINS, Circuit Judge:
 
 
 1
 Jared Beckman ("Beckman") appeals his conviction after a jury trial for importation of marijuana, and possession of marijuana with intent to distribute. We must decide whether the government improperly cross-examined Beckman with a prior arrest and conviction under the guise of attacking Beckman's credibility. We must also consider several other trial court rulings to which Beckman assigns error. We have jurisdiction pursuant to 28 U.S.C. § 1291. We affirm.
 
 FACTUAL BACKGROUND
 A. Ty Gregg's Version of the Facts
 
 2
 On August 6, 2000, Calexico port of entry immigration inspectors discovered 1541 pounds of marijuana in the trailer hitched to a truck driven by Beckman. The central issue at trial was knowledge: whether Beckman knew the marijuana was in the trailer, or whether he had been tricked into transporting the marijuana by the self-acknowledged leader of the smuggling ring and government cooperating witness, Ty Gregg. The government built its case around Gregg, who testified that he had worked as a drug courier and courier recruiter for almost a year before his own arrest, and that while profiling potential drug couriers he approached Beckman and offered him money to transport marijuana across the border. Beckman agreed, and successfully drove five or six prior loads for Gregg.
 
 
 3
 Gregg testified that he and his couriers evaded detection by posing as dune buggy driving teams, complete with racing jerseys and other props. They used large, late-model trucks to pull decorative, enclosed trailers housing the buggies. They stored the contraband in the locked trailer, behind the buggy and concealed by false panels. The couriers locked the trailers and flattened the buggy tires to discourage searches. If questioned, the couriers were instructed to tell inspectors that they were returning from race sessions in Mexicali. Gregg was allowed to testify that Beckman was entrusted with such a large load because he had driven before. Gregg testified to a prior run made by Beckman, and documentary evidence corroborated that the truck Beckman was driving at arrest had crossed through the Calexico checkpoint around the time Gregg claims Beckman's prior run took place.
 
 
 4
 According to Gregg, on the day of the arrest Beckman was the driver of the second truck in a three-truck smuggling caravan. On approaching the border, Beckman stopped to let Gregg exit and cross on foot, planning to pick him up stateside. The first truck passed through primary inspection successfully.
 
 
 5
 Border agents testified that when Beckman reached primary inspection driving the second truck, he identified his citizenship and stated he had nothing to declare to customs. The agent requested permission to search the locked trailer, but Beckman claimed that a friend had the keys, and had already crossed over. The agent observed that Beckman stuttered, avoided eye contact, and appeared nervous. He signaled for dog detection, and the dog alerted near the front of the trailer. After gaining entry through an open side door, agents found the marijuana behind the false panel. A search of the truck also yielded a briefcase that belonged to Gregg, and contained handwritten documents with Beckman's personal information. Gregg testified that he had requested the information so he could register the truck in Beckman's name, and strengthen the credibility of the dune buggy smuggler ruse.
 
 B. Beckman's Version of the Facts
 
 6
 Beckman offered a different account of these events. He claims he migrated to Southern California in the summer of 2000 looking for work. While at Mission Beach in San Diego, and through a mutual acquaintance, he met Gregg, who invited him to take a trip to Mexico to party and race dune buggies. At no time did Gregg discuss transporting marijuana. While in Mexico, Beckman and Gregg smoked marijuana, partied, and drove dune buggies in Mexicali. Gregg explained to Beckman that he was involved in the manufacture of dune buggies and according to Beckman, at one point even gave him a tour of a dune buggy factory.
 
 
 7
 Beckman testified that after about a week in Mexico, he, Gregg and others proceeded by caravan north to Tijuana, where they stopped for a couple hours to eat and drink. Gregg, who had been driving Beckman in one of the three trucks, asked Beckman to drive through the border checkpoint, on the excuse that Gregg had had too much to drink and wanted to avoid problems at the checkpoint. Beckman agreed to drive the second truck alone, believing Gregg had departed to cross in the third truck. When the primary inspectors asked to search the trailer, he explained he didn't have the keys. Realizing that he had been set up, Beckman grew nervous, and could only watch as the dogs alerted and agents peeled away the false panels to reveal 1541 pounds of marijuana.
 
 ANALYSIS
 
 8
 A. Impeachment of Beckman with Prior Convictions
 
 
 9
 Beckman argues that the government improperly referred to a prior arrest and prior conviction of Beckman under the guise of impeachment and that the district court improperly admitted such evidence. We review for an abuse of discretion both the admission or exclusion of evidence, see United States v. Wright, 215 F.3d 1020, 1025 (9th Cir.), cert. denied, 531 U.S. 969 (2000), and a district court's rulings on objections to alleged prosecutorial misconduct. United States v. Sarkisian, 197 F.3d 966, 988 (9th Cir.1999); United States v. Etsitty, 130 F.3d 420, 424 (9th Cir.1997).
 
 
 10
 When asked on direct examination why he had "hit the road" after his divorce, Beckman stated "It was just to, one, see the area that I — unexplored territory I hadn't seen before...." On cross-examination, the government asked Beckman if he recalled being arrested in San Diego for attempted burglary in February of 1999. The prosecutor attempted to jog Beckman's memory by asking if Beckman recalled that he had been found in contempt for failure to appear for trial. Opposing counsel objected, claiming that the prosecutor had misstated Beckman's testimony and was being argumentative. The court overruled the objection, and Beckman answered that he didn't recall being arrested "for that."[1] The government continued, asking Beckman if he recalled being convicted of a trespassing misdemeanor in San Bernardino in 1999. The court sustained opposing counsel's objection on the basis of "improper impeachment."
 
 
 11
 The government argues that it intended the questions to show that Beckman had lied on direct examination by implying that Southern California was "unexplored territory" when in fact the arrest and conviction showed he had been there before. This justification relies on a wholesale mischaracterization of Beckman's testimony. Beckman never said he had not been to Southern California, he just said he was traveling in the summer of 2000 to see "unexplored territory." He could have been traveling through California to get to such unexplored territory. He could have been exploring parts of Southern California that were yet unexplored, notwithstanding his prior trips to San Diego and San Bernardino. Beckman's vague statement on direct examination hardly counts as a claim that Beckman had not "been to San Diego before this," as the government would have it, and it in no way provided cover for introduction of an arrest and misdemeanor conviction into evidence under the flimsy guise of impeachment.
 
 
 12
 The government's conduct appears even more egregious in light of its pre-trial representations to the court that it had no intention of introducing prior bad act evidence at trial. The government seems to have been looking for an opportunity to get the evidence before the jury; that the temptation proved irresistible does not excuse the behavior. While the district court sustained an objection to the San Bernardino conviction, we conclude that the prosecutor's questions regarding the San Diego arrest and San Bernardino conviction were improper and the district court erred in requiring the defendant to answer the question regarding the San Diego arrest.
 
 
 13
 The real issue here is the effect of the government's conduct. Because Beckman objected to any Rule 404(b) material before trial, and objected at the time of the cross-examination, harmless error analysis applies to the improper admission of evidence, and reversal is proper only if the government cannot show that the error was more probably than not harmless. See United States v. Mett, 178 F.3d 1058, 1066 (9th Cir.1999). To obtain relief based on prosecutorial misconduct, Beckman must show that it is more probable than not that the misconduct materially affected the verdict; the alleged misconduct cannot be viewed in a vacuum, but must be viewed in the context of the entire trial. Sarkisian, 197 F.3d at 987. For our purposes here, the inquiry is essentially the same under either standard. We must determine whether we have a "fair assurance" that the verdict was not substantially swayed by the error. Mett, 178 F.3d at 1066.
 
 
 14
 Gregg provided the only evidence of Beckman's knowledge, and Beckman denied Gregg's account. Introduction of a prior arrest and prior conviction likely undermined the credibility of Beckman, at least marginally. Any tipping of the credibility balance between Beckman and Gregg may have had some effect on the jury's decision to convict.
 
 
 15
 The prosecutor's references to prior criminal history also could have led the jury to convict Beckman on the impermissible basis that he was prone to violate the law. See, e.g., Dickson v. Sullivan, 849 F.2d 403, 408 (9th Cir.1988) (observing that our cases "recogniz[e] that evidence of prior criminal acts is highly prejudicial"); United States v. Bagley, 772 F.2d 482, 488 (9th Cir.1985) (observing "the human tendency to draw a conclusion which is impermissible in law: because he did it before, he must have done it again").
 
 
 16
 As much as we find the prosecutor's tactics to have been improper, when viewed in the context of the entire trial, we are not persuaded the misconduct materially affected the verdict. First, Beckman never admitted to the San Diego burglary arrest; the jury was given no evidence that Beckman had actually been arrested; and the court sustained an objection to the question about the San Bernardino misdemeanor conviction. Because no answer was given, the jury did not have evidence that Beckman had actually been convicted. Second, the government did not discuss the arrest or conviction in summation. Finally, the jury was able to assess Beckman's credibility in the broader context of the entire trial. Because Beckman took the stand, the jury could observe his demeanor and compare it to that of Gregg. The jury could also compare the cross-examinations of both witnesses — Gregg was subjected to rigorous impeachment regarding his motives for testifying, and his own confession of guilt for drug offenses. Accordingly, although the prosecutor's questions regarding the San Diego arrest and San Bernardino conviction constituted misconduct and the court erred in requiring Beckman to answer questions regarding the San Diego arrest, our reading of the record leads us to conclude the error was harmless.
 
 B. Gregg's Other Acts Testimony
 
 17
 Beckman also assigns error to the admission of several pieces of testimony at trial, and contends that statements made by the prosecutor in summation violated his Fifth Amendment rights. We address each argument in turn.
 
 
 18
 First, Beckman argues that the district court failed to exclude, on the basis of Fed.R.Evid. 404(b), Gregg's testimony about Beckman's prior drug runs. Evidence of "other acts" is not subject to Rule 404(b) analysis if it is "inextricably intertwined" with the charged offense. See United States v. Vizcarra-Martinez, 66 F.3d 1006, 1012 (9th Cir.1995). This exception applies when (1) "particular acts of the defendant are part of ... a single criminal transaction," or when (2) "`other act' evidence ... is necessary [to admit] in order to permit the prosecutor to offer a coherent and comprehensible story regarding the commission of the crime." Id. at 1012-13.
 
 
 19
 Gregg's testimony regarding Beckman's prior drug run was necessary to provide a "coherent and comprehensible story" regarding the crimes for which Beckman was charged. The other act testimony was intended to establish Gregg's relationship to Beckman, to show that the relationship was ongoing, to refute Beckman's claim that he had no knowledge that marijuana was in the trailer, and to explain why Beckman was entrusted with marijuana valued at over $1,000,000. See id. at 1013 ("[T]he jury cannot be expected to make its decision in a void — without knowledge of the time, place, and circumstances of the acts which form the basis of the charge.") (internal quotation marks and citations omitted). The evidence is "inextricably intertwined" with the charged offense and is not subject to exclusion on the basis of Rule 404(b).
 
 
 20
 Beckman argues that the court admitted the challenged testimony solely on the basis of inextricable intertwining, but the record also indicates that the court concluded the other acts evidence was admissible under Rule 404(b). Other acts evidence is admissible under Rule 404(b) if it (1) tends to prove a material point in issue; (2) is not too remote in time; (3) is proven with evidence sufficient to show that the act was committed; and (4) if admitted to prove intent, is similar to the offense charged. See United States v. Murillo, 255 F.3d 1169, 1175 (9th Cir.2001), cert. denied, 122 S.Ct. 1342 (2002). The court must then assess the evidence under Fed.R.Evid. 403. See United States v. Rude, 88 F.3d 1538, 1549-50 (9th Cir.1996).[2]
 
 
 21
 Gregg's testimony satisfies the requirements of Murillo: (1) the other act testimony establishes knowledge, intent, and lack of mistake — the only real issue in dispute at trial; (2) the prior act was close in time, occurring within a month of Beckman's arrest; (3) the evidence of the other act appears sufficient (documentary evidence corroborated an earlier border crossing by the truck in which Beckman was arrested and a search revealed documents that were intended to gather Beckman's personal information for a title transfer); and (4) the prior act is the same as the charged crime. Finally, the record demonstrates that the court closely monitored Gregg's other acts testimony for compliance with Rule 403.
 
 
 22
 Because Gregg's other acts testimony is admissible both as inextricably intertwined evidence, and on the basis of Rule 404(b), we cannot conclude the district court abused its discretion in allowing it before the jury.
 
 C. The Testimony of Agent Harris
 
 23
 Beckman also argues that United States Customs Agent Harris offered hearsay testimony when he related that, during a proffer session, Gregg told Agent Harris that he was jailed with two of his recruited couriers, one of whom was Beckman. Beckman argues that this statement is not admissible as a prior consistent statement, and should have been excluded as hearsay.
 
 
 24
 Beckman's argument makes sense only if Harris's testimony was hearsay to begin with. However, the statement was not admitted for the truth of the matter asserted, namely that Gregg was indeed jailed with Beckman, or that Beckman was Gregg's courier. Instead, the statement was offered to show that Gregg brought up his relationship to Beckman on his own, and not at the prodding of the government. The government called Agent Harris to rebut the implication that Gregg offered false testimony to escape punishment for his own criminal misdeeds. Harris's testimony about Gregg's statement was thus admissible under Fed.R.Evid. 801(c) — not as a prior consistent statement exception to hearsay, but as nonhearsay, and the district court did not abuse its discretion in admitting the evidence.
 
 D. Gregg's Alleged Opinion Testimony
 
 25
 Next, Beckman argues that the court erred in allowing Gregg to offer generalized structure evidence of drug operations. See United States v. Vallejo, 237 F.3d 1008, 1017 (9th Cir.2001) (government agent's expert testimony on general structure and operation of drug operations inadmissible to prove knowledge of drug carrier). Vallejo has no application to this case. Gregg testified as a percipient fact witness, not as an expert on the drug trade. He offered specific testimony to establish that Beckman knew he was acting as a courier. He offered direct evidence that Beckman was entrusted with a large load because he had been successful on a prior run. He testified from personal knowledge. In contrast, the agent's generalized structure evidence in Vallejo offered no link between the general practice of drug cartels and the particular acts of the defendant. The Vallejo court held the testimony to be irrelevant and prejudicial because no such link was established. Contrary to Beckman's assertions, Gregg did not offer expert evidence in the guise of fact witness testimony and did not raise a Vallejo issue. The court did not abuse its discretion in allowing the testimony.
 
 
 26
 E. Commentary on Beckman's Post-Arrest Silence
 
 
 27
 Finally, Beckman argues that opposing counsel's comments during summation violated his Fifth Amendment right to silence. We review de novo alleged violations of a defendant's Fifth Amendment rights arising from a prosecutor's improper comments on the silence of an accused. United States v. Pino-Noriega, 189 F.3d 1089, 1098 (9th Cir.1999). In closing argument the government suggested that if Beckman's courtroom testimony about being tricked was actually true he would have offered it at primary inspection. The government also argued that Beckman could have told inspectors that he thought Gregg was behind him in the third truck. These comments refer only to Beckman's silence at primary inspection, before arrest and before Miranda warnings had been given.
 
 
 28
 The use of a defendant's pre-arrest, pre-Miranda silence is permissible as impeachment evidence and as evidence of substantive guilt. See United States v. Oplinger, 150 F.3d 1061, 1067-68 (9th Cir.1998). No error resulted from the government's summation commentary on Beckman's silence.
 
 CONCLUSION
 
 29
 Although the prosecutor committed misconduct by attempting to improperly impeach Beckman with his prior arrest in San Diego and his prior misdemeanor conviction in San Bernardino and the district court erred in allowing such cross-examination, the error was harmless in light of the full record. In all other respects the rulings of the district court are affirmed.
 
 
 30
 AFFIRMED.
 
 
 
 Notes:
 
 
 *
 The Honorable Charles R. Weiner, Senior United States District Judge for the Eastern District of Pennsylvania, sitting by designation
 
 
 [1]
 In February 1999 Beckman was convicted of commercial burglary and petty theft in San Diego, California. Beckman was held in contempt for failure to appear for trial. Both charges stemmed from a single criminal act. The record is not clear on what crime Beckman was charged with on arrest, which was the specific subject of the government's first line of inquiry on cross-examination
 In May 1999, Beckman was convicted of misdemeanor trespassing in San Bernardino, which was the subject of the government's second line of inquiry on cross-examination.
 
 
 [2]
 The record shows that court recited the Rule 404(b) admissibility factors in admitting the evidence, and specifically noted that the evidence went to knowledge and lack of mistake. The court also gave a limiting instruction to that effect, limited Gregg's testimony to only one prior act episode, and instructed defense counsel to object during trial to enforce this restriction on the government