**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Rex K. DeGEORGE, aka Rex Karageorge DeGeorge, Rex Karageorgiou DeGeorge, Angelos George Karageorgiou, Angelos George Karageorge, Defendant–Appellant.**

No. 02–50365.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted June 10, 2004.

Filed Aug. 30, 2004.

William J. Kopeny, William J. Kopeny & Associates, Irvine, CA, for the defendant-appellant.

Eileen M. Decker, Assistant United States Attorney, Los Angeles, CA, for the plaintiff-appellee.

Before: D.W. NELSON, GIBSON,* and GRABER, Circuit Judges.

GIBSON, Senior Circuit Judge:

Rex K. DeGeorge appeals his conviction and sentence following a month-long jury trial for conspiracy, mail fraud, wire fraud, and perjury. The government alleged that DeGeorge participated in a scheme to defraud by purchasing a yacht, inflating its value through a series of sham transactions, obtaining insurance on the yacht at the inflated value, scuttling it off the coast of Italy, and attempting to collect the insurance proceeds, in part by lying about the cause of the sinking during civil litiga-

---

* The Honorable John R. Gibson, Senior Circuit Judge, United States Court of Appeals for the Eighth Circuit, sitting by designation.

tion with the yacht's insurer. We affirm the convictions but reverse and remand for resentencing.

## FACTS

DeGeorge, an attorney, contracted with an Italian firm in June 1992 for the construction of a 76–foot yacht, later named the *Principe di Pictor*, for $1.9 million. In late July of that year, DeGeorge assigned his rights in the construction contract to Continental Pictures Corp., which in turn sold its interest in the yacht to Polaris Pictures Corp. for $3.6 million in October. DeGeorge himself continued throughout this time to make payments to the Italian builder.

Polaris had been formed by DeGeorge, and its President at the time of the yacht's purchase was Paul Ebeling, who was later indicted as a co-conspirator and who eventually testified as a government witness at trial. Polaris ostensibly financed its purchase of the yacht through notes issued by U.S. Inbanco, Ltd., a corporation formed by DeGeorge and incorporated on the same day that Polaris bought the yacht from Continental. Ebeling testified that the name "Inbanco" was designed to give the appearance that the corporation was a bank. Inbanco was given a security interest in the yacht in exchange for the notes. With the exception of DeGeorge's original contract with the Italian builder, no money changed hands in any of these transactions.

Soon after purchasing the yacht from Continental, Polaris entered into a contract with one Jacob Wizman, an acquaintance of DeGeorge's. Wizman agreed to buy a 98% interest in the *Principe* for the price of $3.6 million if it could be delivered to him "as a new vessel" in January 1993.

DeGeorge disguised his connection with Polaris by engaging in a stock swap with Tridon Corporation about two weeks before Continental sold the yacht to Polaris. DeGeorge traded all his shares of Polaris to Tridon Corporation, whose CEO was Ebeling, in exchange for two million shares of Tridon stock. The stock swap agreement contained a provision stating that all shares of Polaris stock would revert to DeGeorge if either Tridon or Polaris filed bankruptcy or became unable to meet its financial obligations. Ebeling testified that, to his knowledge, no money ever actually changed hands between Inbanco, Tridon, and Polaris.

The net effect of these transactions was to make Tridon, and not DeGeorge, the owner of Polaris, which now owned the *Principe*, which now appeared to have a market value of $3.6 million.

Tridon's ownership of Polaris was necessary for insurance purposes. DeGeorge had a rather extensive history of boat losses, including three instances—one alleged theft and two alleged sinkings—where he was fully compensated by insurance companies. Ebeling testified that DeGeorge was concerned that his loss history would prevent him from obtaining insurance in his own name. Whether this evidence of prior losses was admissible was a contested issue at trial, and the district court ultimately allowed the government to show only that three prior vessels owned by DeGeorge were insured; that he claimed the vessels were lost at sea; and that the vessels were not recovered. The government was not permitted to elicit details of the incidents themselves or the fact that DeGeorge had collected insurance proceeds on the losses.

Polaris purchased insurance from Cigna Property and Casualty Insurance Company in late October 1992. The insurance application listed $3.675 million as the purchase price of the yacht, made no mention of DeGeorge whatsoever, and listed U.S. Inbanco, Ltd. as the loss payee. Cigna issued an insurance policy binder to Polar-

is on October 22, insuring the yacht for $3.5 million.

The government presented evidence that DeGeorge, Ebeling, and a third associate, Gabriel Falco,[1] set out from Viareggio, Italy, on November 4, 1992, for the maiden voyage of the *Principe*. For the first day of their journey, the yacht was captained by an Italian man named Ramono Romani, who was aided by an additional Italian crew member. When the group reached Naples, Italy, on November 5, DeGeorge dismissed Romani and the crew member.

According to testimony from Ebeling and Falco, the three men left Naples without a captain on the evening of November 6. They sailed for several hours, with DeGeorge and Falco alternating at the helm while Ebeling read and slept. Sometime in the middle of the night, DeGeorge instructed Falco to take the power tools they had purchased a few days earlier and begin cutting holes in the boat. For the next six or seven hours, DeGeorge, Falco, and Ebeling took turns cutting holes and trying to do anything else necessary to sink the *Principe,* including smashing equipment and opening vents in the engine room to make the boat take on more water. The scene became rather frantic, and at one point DeGeorge even began ramming a dinghy into the side of the yacht. Despite their efforts, and despite taking on a significant amount of water, the *Principe* refused to sink.

Sometime after daybreak, Italian authorities patrolling the coast spotted the yacht and began to approach. Noticing the Italian ship on the horizon, the three men disembarked the *Principe* and got into rescue dinghies to await the arrival of the Italians. Falco and Ebeling testified

that while they waited DeGeorge devised a story for the three men to explain how they ended up off the coast of Italy with a scuttled yacht.

DeGeorge's story went as follows: he, Ebeling, and Falco had been in Naples looking for a captain. A man named Captain Libovich,[2] who resembled Robert Redford and claimed to be a former Russian submarine captain, heard of their search and offered his services, along with those of his two crewmen. The six men took the yacht out from Naples for what was ostensibly to be a test drive. The captain and his men each brought aboard two large black duffel bags.

After several hours at sea, the captain and his crewmen overpowered the others and forced them into the cabin of the yacht. The captain and crew then set about cutting holes in the yacht so that it would sink. Sometime near dawn, a black speed boat pulled up next to the yacht. Libovich and his men unloaded their six bags onto the boat, jumped aboard, and sped off.

DeGeorge, Ebeling, and Falco recited this story to the Italian authorities once they were finally picked up and returned to land. They continued to tell their Libovich stories to Italian investigators during the ensuing months. Due to certain inconsistencies and the overall suspiciousness of their story, the three men were incarcerated briefly in Salerno, Italy, and forced to remain under house arrest in that city for several months. The Italian authorities finally allowed the three men to return home to the United States in February 1993.

1. Falco was charged separately for his role in the scheme, *see United States v. Falco,* CR 99–761–LGB, and also testified against DeGeorge in this case.

2. The record occasionally spells the captain's name as "Leibowitz." Because DeGeorge's brief uses the spelling "Libovich," it is followed here.

Ebeling, acting in his capacity as Polaris's president and at the behest of DeGeorge, submitted a claim to Cigna on February 17, 1993, seeking payment under the insurance policy. The request repeated the Libovich story. Cigna refused to pay and informed Polaris on April 20, 1993, that it was rescinding the insurance policy due to Polaris's misrepresentations and concealment of material information, including DeGeorge's participation in the venture. On the same day, Cigna filed a civil lawsuit against DeGeorge, Ebeling, Polaris, and others seeking rescission of the insurance contract. Polaris filed a counterclaim for payment under the insurance policy.

Cigna ultimately prevailed on its rescission claim, obtained summary judgment on the counterclaim, and was awarded attorney's fees. The judgment was affirmed on appeal. *See Cigna Prop. & Cas. Ins. Co. v. Polaris Pictures Corp.,* 159 F.3d 412 (9th Cir.1998). The district judge who presided over the case referred the matter to the United States Attorney's Office for the Central District of California for a possible perjury investigation.

On August 18, 1997, the U.S. Attorney submitted a request to Italian authorities seeking interviews with eight Italian witnesses and seeking documents related to the scuttling of the *Principe.* A grand jury subpoena was issued one week later to Neil S. Lerner, one of Cigna's attorneys in the civil case, requesting all documents related to that case.

On August 25, 1997, the government filed an *ex parte* application for an order suspending the statute of limitations under 18 U.S.C. § 3292, based on the pending foreign-evidence request. United States District Judge Stephen Wilson issued such an order on September 3, 1997. DeGeorge was indicted in January 1999 on charges including mail fraud, wire fraud, and perjury. The conspiracy count was added in a superseding indictment returned in April 2000.

On September 3, 1999, DeGeorge moved to dismiss what are now Counts Two through Eleven of the indictment, charging mail fraud and wire fraud, as timebarred under the statute of limitations, 18 U.S.C. § 3292. The district court denied the motion, and this court denied DeGeorge's petition for a writ of mandamus. *See DeGeorge v. U.S. Dist. Court for Cent. Dist. of Cal.,* 219 F.3d 930 (9th Cir.2000). The case eventually went to trial, where DeGeorge was convicted on all 16 counts and sentenced to 90 months' imprisonment, three years' supervised release, restitution of $2,872,634.89, and a special assessment of $850.

## I.

DeGeorge first argues that the district court erred in denying his pre-trial motion to dismiss the charges based on the delay of more than six years between the alleged scuttling of the *Principe* and the initial indictment. He contends that the delay exceeded the statute of limitations and caused the loss of witnesses and evidence favorable to his defense; furthermore, he suggests that the delay was a tactical move by the government, designed to prejudice his defense.

██ The district court's denial of a motion to dismiss based on pre-indictment delay is reviewed for an abuse of discretion. *United States v. Mills,* 280 F.3d 915, 920 (9th Cir.2002). DeGeorge must satisfy a two-part test in order to establish that pre-indictment delay has violated his due process rights: 1) he must prove that he suffered actual, non-speculative prejudice from the delay; and 2) he must show that the delay, when balanced against the government's reasons for it, " 'offends those fundamental conceptions of justice which lie at the base of our civil and political

institutions.' " *United States v. Doe*, 149 F.3d 945, 948 (9th Cir.1998) (quoting *United States v. Sherlock*, 962 F.2d 1349, 1353–54 (9th Cir.1989)).

DeGeorge claims he is relieved from proving prejudice because there is a presumption of actual prejudice where, as here, the pre-indictment delay exceeds the applicable statute of limitations. The government is quick to respond that the statute of limitations did not expire; instead, the district court's order under 18 U.S.C. § 3292 extended the limitations period until after the return of the original indictment.

Even if DeGeorge is understood to argue that a presumption of prejudice is appropriate where the pre-indictment delay exceeds the limitations period that *would have* applied in the absence of a § 3292 extension, his argument is unavailing. In *United States v. Bischel*, 61 F.3d 1429, 1436 (9th Cir.1995), we specifically refused to recognize a presumption of actual prejudice in such a situation and held instead that a defendant retained the burden of showing actual, nonspeculative prejudice.

DeGeorge claims he was prejudiced by the loss of evidence that would have corroborated the Libovich story. This evidence includes the following witnesses: 1) Felice Pizza, either the owner of or waiter at a restaurant in Naples who, according to DeGeorge, was a known Italian criminal, could have testified about DeGeorge's search for a new captain, and may have even directed Libovich to DeGeorge; 2) Arno Pieratti, a U.S. Embassy official who allegedly distracted Italian authorities from searching for Libovich by making false accusations that DeGeorge was a drug smuggler; 3) passengers and crew of neighboring yachts who could have testified to seeing Libovich or, at the very least, more than three passengers on the *Principe* when it left the port; and 4) port

employees, particularly dock watchman Mario Mulas, who could have provided similar testimony. DeGeorge also contends that the delay resulted in the loss of the yacht itself, which could have been examined for physical evidence tending to support his version of events.

There is no evidence that the unavailability of Pizza prejudiced DeGeorge's defense. Captain Pier Luigi Pisano, an Italian who was the commander of the Salerno Police during the investigation of the scuttling of the *Principe*, testified in a deposition that he interviewed Felice Pizza on November 12, 1992. During the interview, Pizza said he saw DeGeorge, Ebeling, and Falco at the restaurant but mentioned nothing about DeGeorge being interested in finding a captain. Pizza said no one came near the three men while they were there. DeGeorge has provided no evidence other than his own selfserving speculation to show that, despite Pisano's interview, Pizza would have given favorable testimony for DeGeorge's defense.

Likewise, the only evidence suggesting that Arno Pieratti, who died 18 months before trial, would have provided favorable testimony to the defendant comes from DeGeorge's own speculation. DeGeorge suggests that Pieratti gave the Italian authorities false information about his drug ties because Pieratti "wanted to focus suspicion and guilt on [DeGeorge] instead of Libovich." While the record shows that Pieratti did, indeed, erroneously suggest that DeGeorge was involved in a drug smuggling ring, he provided this information in response to a request from the Italian authorities about DeGeorge after the Italians had decided to detain DeGeorge, Ebeling, and Falco. By this time, the Italians had essentially given up their investigation of the Libovich story. Moreover, Pieratti corrected the error ten days later in a supplemental report. There is

no evidence that Pieratti gave false information in order to prevent the police from searching for Libovich.

DeGeorge also fails to prove prejudice from the loss of testimony of passengers and crew of neighboring yachts. Regardless of whether Italian investigators searched for these individuals in the days following the scuttling of the *Principe*—a point of disagreement between the parties—DeGeorge has provided no evidence to suggest that any witnesses would have testified to seeing more than three passengers onboard the *Principe*.

Admittedly, Mario Mulas, the dock watchman in Naples, may have provided helpful testimony. He told Italian authorities in November 1992 that he noticed strangers getting on and off the *Principe* while it was docked in Naples and observed a tall person, approximately 40 years of age, with a slender build and grey beard, speak to one of the *Principe*'s crewmen. Nonetheless, this marginally useful testimony is not sufficient to satisfy the "heavy burden" DeGeorge must meet for showing actual prejudice. *See United States v. Martinez*, 77 F.3d 332, 335 (9th Cir.1996). Moreover, DeGeorge opposed the taking of Mulas's deposition in the district court in 1999, before Mulas's disappearance, on the ground that his testimony would be immaterial and non-essential. It is incongruous, at best, for DeGeorge to argue that he was prejudiced by the loss of a witness's testimony that DeGeorge himself tried to preclude.

■ Finally, the loss of the *Principe* does not constitute actual prejudice amounting to a denial of due process. DeGeorge has not shown that the scuttled vessel would have been helpful to his defense and has provided no evidence that the government acted in bad faith in connection with its loss. The government has no obligation under the due process clause to preserve "potentially useful" evidence,

particularly where there is no showing of bad faith. *See Illinois v. Fisher*, 540 U.S. 544, —— ——, 124 S.Ct. 1200, 1202–03, 157 L.Ed.2d 1060 (2004) (per curiam); *Arizona v. Youngblood*, 488 U.S. 51, 58, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988).

Because we conclude that DeGeorge cannot show actual prejudice, we need not reach the second part of the test for preindictment delay.

## II.

DeGeorge next challenges the district court's order under 18 U.S.C. § 3292 tolling the statute of limitations on the criminal charges against him. On August 18, 1997, the Department of Justice sent a formal request to Italian authorities seeking interviews with eight Italian witnesses and documents related to the scuttling of the *Principe*. A grand jury subpoena was issued on August 25, 1997, to Neil S. Lerner, one of Cigna's attorneys in the civil case, requesting all documents related to that case. The same day, the U.S. Attorney filed an *ex parte* application for an order under 18 U.S.C. § 3292 suspending the statute of limitations based on the pending foreign-evidence request. United States District Judge Stephen Wilson issued a § 3292 order on September 3, 1997, tolling the statute for a period not to exceed three years.

### A.

■ DeGeorge filed a motion to dismiss what are now Counts Two through Eleven of the indictment on the ground that the tolling order was improperly issued and therefore the statute of limitations had expired. The district court denied his request, and DeGeorge petitioned this court for a writ of mandamus. We denied his petition and held that mandamus did not lie because, *inter alia*, the district court did not clearly err in denying

DeGeorge's motion to dismiss. *See De-George v. U.S. Dist. Court for Cent. Dist. of California*, 219 F.3d 930, 936–40 (9th Cir.2000). DeGeorge raises essentially the same arguments in this appeal that he raised in his mandamus petition, including that the district court's § 3292 tolling order was improper because: 1) the U.S. government was already in possession of the foreign evidence requested; 2) the requested evidence was not material to the government's case; 3) there was no grand jury impaneled to investigate DeGeorge's case at the time the § 3292 application was filed; and 4) the government failed to meet the requisite preponderance of the evidence standard in its motion. Although we considered these arguments before, we review them anew because of the deferential standard applied in the first instance. On direct appeal, we review the district court's denial of the motion to dismiss *de novo* and its factual findings underlying the legal ruling for clear error. *See United States v. Ziskin*, 360 F.3d 934, 942 (9th Cir.2003).[3]

Title 18 U.S.C. § 3292(a)(1), in relevant part, states:

> Upon application of the United States, filed before return of an indictment, indicating that evidence of an offense is in a foreign country, the district court before which a grand jury is impaneled to investigate the offense shall suspend the running of the statute of limitations for the offense if the court finds by a preponderance of the evidence that an offi-

cial request has been made for such evidence and that it reasonably appears, or reasonably appeared at the time the request was made, that such evidence is, or was, in such foreign country.

DeGeorge argues that a district court may issue an order under § 3292 suspending the statute of limitations only if the government is seeking evidence that 1) is not already in its possession and 2) is "material or otherwise essential" to the charges. We are unpersuaded. As this court observed in denying DeGeorge's mandamus petition, "DeGeorge's interpretation of 'evidence' in section 3292(a)(1) is entirely without textual support in the statute or in the reality of grand jury investigations." *DeGeorge*, 219 F.3d at 937. *See also United States v. Miller*, 830 F.2d 1073, 1076 (9th Cir.1987) (language of § 3292 "plainly indicates that Congress set no store upon the evidence still being abroad as a precondition for granting the application"). Regardless of whether it would be good policy to impose the requirements urged by DeGeorge before allowing suspension of the statute of limitations, Congress did not do so.

■ The closer question is the meaning of the phrase "the district court before which a grand jury is impaneled to investigate the offense." DeGeorge understands this phrase to require a showing by the government that a grand jury is actively investigating the particular offense in question and has already heard evidence related to the case before a tolling order

---

**3.** DeGeorge argues that any factual findings made by the district court also should be reviewed *de novo* because, in his view, the district judge who issued the order suspending the statute of limitations simply accepted the government's factual allegations supporting the § 3292 application as true. This argument is not supported by the case DeGeorge cites, *United States v. Freitas*, 800 F.2d 1451, 1454–55 (9th Cir.1986), because the district court in that case deliberately *as-*

*sumed* the government's facts to be true for the sake of argument. The district court granting the tolling order here was required by § 3292 to evaluate the affidavit and exhibit submitted by the government in support of the application to ensure that the government met its burden of proof. DeGeorge presents no evidence other than his own conclusory assertion that the district court failed to evaluate the evidence in this manner.

under § 3292 may be issued. The government urges that we interpret the quoted phrase as a mere venue requirement specifying the particular court that may issue the tolling order. This is a question of first impression. In considering DeGeorge's mandamus petition, we concluded that the statutory text was ambiguous and not clarified by the scant legislative history[4] and therefore could plausibly be interpreted either way. *DeGeorge*, 219 F.3d at 939–40.

We adopt the government's interpretation of § 3292 as a venue requirement because we believe it best reflects the realities of grand jury investigations. DeGeorge's attempt to impose an active investigation requirement ignores the fact that grand juries are continuously impaneled in the Ninth Circuit and only rarely are called to investigate particular offenses. Moreover, the foreign evidence sought by the government often may be critical to obtaining an indictment, yet DeGeorge asks this court to hold that evidence must be presented to the grand jury *before* the § 3292 application can be filed. This would require the government to present evidence and witnesses to the grand jury even if it lacks evidence to support an indictment. In fact, DeGeorge's interpretation would frustrate the

entire purpose of § 3292. As he views it, a § 3292 application would operate as follows: first, the government would present some evidence to the grand jury; second, it would apply for the § 3292 tolling order; third, it would spend up to three years waiting for and examining the foreign evidence; and fourth, it would finally return to the grand jury to obtain an indictment. The grand jury investigation of the offense would therefore last as long as three years. But we have held that an indictment is invalid unless brought within 18 months of impanelment of the grand jury. *United States v. Armored Transp., Inc.*, 629 F.2d 1313, 1315–17 (9th Cir.1980); *see also* Fed.R.Crim.P. 6(g) ("A grand jury must serve until the court discharges it, but it may serve more than 18 months only if the court, having determined that an extension is in the public interest, extends the grand jury's service. An extension may be granted for no more than 6 months, except as otherwise provided by statute."). Thus, DeGeorge's interpretation would effectively prevent the government from ever taking advantage of the entire three-year extension.[5]

We are satisfied that district courts retain sufficient oversight powers to prevent any abuse of § 3292 by the government. *Cf. United States v. Meador*, 138 F.3d 986,

---

4. House Report No. 98–907 states:
   Subsection (a)(1) of new section 3292 authorizes a Federal court, upon application of a Federal prosecutor that is made before the return of an indictment and that indicates that evidence of an offense is located in a foreign country, to suspend the running of the applicable statute of limitation. If the court finds by a preponderance of the evidence that (1) an official request has been made for the evidence and (2) it appears (or reasonably appeared at the time the official request was made) that the evidence is (or was) in that country, the court must order such suspension.
   H. Rep. No. 98–907, at 7 (1984), *reprinted in* 1984 U.S.C.C.A.N. 3578, 3584.

5. Admittedly, it would be possible for the government to present evidence to an initial grand jury for the purpose of validating its § 3292 application, then, if necessary, present that evidence again and any additional foreign evidence to a second grand jury in order to obtain the actual indictment. This seems to be an unnecessary burden on the government and also would waste the time of the first grand jury. *Cf. Armored Transp.*, 629 F.2d at 1317 ("The purpose of the grand jury is to hear testimony and to consider whether an indictment should be handed down against the person charged. It makes little sense to create such a body but to withhold its power until a later time.").

994 (5th Cir.1998) ("[Section 3292] should not be an affirmative benefit to prosecutors, suspending the limitations period, pending completion of an investigation, whenever evidence is located in a foreign land. It is not a statutory grant of authority to extend the limitations period by three years at the prosecutors' option."). In each instance, the government will be required to prove to the court that the evidence actually is or was in the foreign country, has been officially requested, and is related to an offense. We are confident that district courts will not simply rubber-stamp the government's request, but will hold the government to its burden. Because the government clearly met its burden in this case, the district court properly denied DeGeorge's motion to dismiss.

### B.

■ DeGeorge raises an alternative challenge under § 3292, relying on the provision in subsection (c)(2) that the government is not entitled to the entire three-year extension of the statute of limitations if the foreign authorities from whom evidence is requested take "final action" with respect to that request "before such [limitations] period would expire without regard to this section." 18 U.S.C. § 3292(c)(2). In such a case, the extension of the limitations period shall not exceed six months. *Id.* DeGeorge argues that the Italian authorities took final action on June 2, 1998, when the U.S. Attorney interviewed six of the eight requested witnesses, and thus the statute of limitations for several of the offenses expired on December 2, 1998, more than one month before he was indicted.

■ " '[F]inal action' for purposes of § 3292 means a dispositive response by the foreign sovereign to both the request

for records and for a certificate of authenticity of those records, as both were identified in the 'official request.' " *United States v. Bischel,* 61 F.3d 1429, 1434 (9th Cir.1995). Because the Italian government did not at any time indicate, up or down, its ability to locate and produce the two missing witnesses, Mario Mulas and D'Andrea Raffeali, there was no "final action." *See id.; Meador,* 138 F.3d at 992 ("We are persuaded that a determination of when 'final action' has been taken by a foreign government, within the meaning of [§ 3292], must turn on whether a dispositive response to an official request for evidence from our government has been obtained."). In the absence of final action by the foreign government, § 3292(c)(1) states that the extension of the applicable statute of limitations "shall not exceed three years." DeGeorge's indictment clearly occurred within three years after the applicable statute of limitations would have expired and is therefore timely.

### III.

DeGeorge next argues that the conspiracy count, Count One of the indictment, is time-barred. His argument is rather imprecise but appears to assert that the overt acts underlying the conspiracy took place more than five years before the return of the First Superseding Indictment, dated April 5, 2000, which added the conspiracy count for the first time.

■ This argument is unpersuasive. The First Superseding Indictment specifically alleged that the last overt acts took place on April 22, 1996, when DeGeorge allegedly perjured himself during the civil trial.[6] The jury clearly concluded that DeGeorge had committed those overt acts

---

**6.** The Second Superseding Indictment, which was the operative indictment at trial, con-

tained an identical allegation.

because it convicted him on four counts of perjury based on his testimony from that date, and a fifth count from April 21, 1995, which also is within the five-year period. DeGeorge does not argue that his perjury in the civil case could not constitute an overt act in a continuing criminal conspiracy. *See generally Grunewald v. United States,* 353 U.S. 391, 405, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957) (holding that concealment intended solely to cover up an already executed crime would not constitute an overt act for purposes of a conspiracy prosecution, whereas concealment needed to achieve the central purpose of the conspiracy would constitute such an overt act). The overt acts of perjury occurred well within the five years of April 5, 2000, and therefore are sufficient to bring the conspiracy count within the statute of limitations. *See, e.g., Flintkote Co. v. United States,* 7 F.3d 870, 873 (9th Cir.1993) ("As long as *some* part of the conspiracy continued into the five-year period preceding the indictment, the statute of limitations did not insulate [the defendant] from criminal liability for actions taken more than 5 years prior to the time of indictment.").

### IV.

■ DeGeorge also attempts, in a single sentence, to apply *United States v. Fuchs,* 218 F.3d 957 (9th Cir.2000). In *Fuchs,* the court held that the district court committed plain error in failing to instruct the jury that it could convict the defendant on a conspiracy count only if it concluded that an overt act in furtherance of the conspiracy had occurred within the applicable limitations period. *Id.* at 962. The court explained that it was impossible to tell whether the jury had based its general verdict on the conspiracy charge solely on overt acts falling outside the limitations period. *Id.* There is no such problem in DeGeorge's situation. The jury specifically convicted him on four counts of perjury based on testimony he

gave on April 22, 1996. Because DeGeorge does not contest that these acts of perjury can constitute overt acts for purposes of a conspiracy, and because the perjury occurred within the limitations period, the conspiracy conviction was clearly based on a legally adequate ground. Any error in the district court's instruction to the jury is therefore harmless.

### V.

DeGeorge argues that his perjury convictions should be overturned because the subject matter of the allegedly false statements was not material and, with respect to Counts Twelve and Sixteen, the statements were not literally false. Count Twelve stemmed from DeGeorge's sworn deposition in the civil case and Counts Thirteen through Sixteen from his trial testimony in that case. He also alleges the evidence supporting Count Four, mail fraud, is insufficient to sustain his conviction.

Because DeGeorge failed to move for a judgment of acquittal until more than a month after trial, the government argues that he has completely waived his right to appeal the sufficiency issue. *See* Fed. R.Crim.P. 29(c) (defendant may move for judgment of acquittal within seven days after guilty verdict); *United States v. Ward,* 914 F.2d 1340, 1346 (9th Cir.1990) (concluding that, because the defendant failed to move for judgment of acquittal during trial, he "waived his right to challenge the sufficiency of the evidence on appeal"); *United States v. Harden,* 846 F.2d 1229, 1232 (9th Cir.1988) ("As the Government properly points out in its brief, Harden did not preserve [the sufficiency] issue on appeal because he failed to raise it at the district court level."). However, this court has frequently reviewed "waived" sufficiency of the evidence arguments, sometimes citing the "plain error"

standard, *see, e.g., United States v. Morfin*, 151 F.3d 1149, 1151 (9th Cir.1998) (per curiam); *United States v. Hernandez*, 876 F.2d 774, 777 (9th Cir.1989), and sometimes observing that the evidence would have been sufficient even if the defendant had properly preserved the objection, *see, e.g., Harden*, 846 F.2d at 1232. Regardless of the standard we apply here, our review of the record reveals that sufficient evidence was introduced to support DeGeorge's conviction on Counts Four and Twelve through Sixteen.

### A.

■ DeGeorge argues that the statement giving rise to his conviction on Count Twelve was not literally false. The relevant testimony came from DeGeorge's deposition in the civil case:

Q. To your knowledge, did the *Principe di Pictor* have any power tools on board?

A. No, sir.

DeGeorge argues that the question was ambiguous because the time frame was not specified and the surrounding context suggested that the question referred to the time of the *Principe*'s return to port following the scuttling, at which point it is undisputed that no tools were on board, rather than the time of the vessel's departure from Naples. *See United States v. Sainz*, 772 F.2d 559, 562–64 (9th Cir.1985) (reversing defendant's conviction and emphasizing the need to look at allegedly perjurious statements in context). He points out that the questions preceding this one involved the return of the vessel to port following the scuttling and the questions immediately following it involved the disposition of the tools that Libovich had allegedly brought on board.

■ In reviewing a perjury conviction, "[o]ur central task is to determine whether the jury could conclude beyond a reasonable doubt that the defendant understood the question as did the government and that, so understood, the defendant's answer was false." *United States v. Boone*, 951 F.2d 1526, 1533 (9th Cir.1991) (internal quotation marks omitted). Viewing the evidence in the light most favorable to the verdict, we are convinced that the jury could have concluded beyond a reasonable doubt that the question dealt with the time of the *Principe*'s departure from the port in Naples.

The questions preceding the one at issue here involved the damage done to the *Principe*, which DeGeorge himself acknowledged during the deposition was clearly done by power tools. Immediately after asking whether DeGeorge had knowledge of power tools on board the *Principe*, the examiner asked DeGeorge whether "Mr. Libovich or any of the two persons with him [had] any power tools in their black duffle bags?" Thus, the questions essentially progressed according to the following sequence: first, the examiner sought to establish that serious damage had been done to the *Principe*; second, he wanted to determine whether the tools used to inflict the damage were brought on board by DeGeorge himself; and third, if not, he sought DeGeorge's explanation for the source of the tools. Because the jury could have concluded beyond a reasonable doubt that DeGeorge understood the question in Count Twelve as involving the second step of this sequence, we affirm DeGeorge's conviction on this count.

### B.

■ The perjury charge in Count Sixteen involved the following question and answer:

Q. Did you purchase any power cutting tools and have them on board the *Principe?*

A. No, sir.

DeGeorge argues that there was not sufficient evidence to show that he personally purchased the power tools.

DeGeorge's argument is utterly without merit. Ebeling specifically testified: "Mr. Falco and Mr. DeGeorge went into the hardware store and they bought drills and hammers and electric saws and tools." Likewise, Falco was asked: "Who bought the tools?" He replied: "Mr. DeGeorge." This evidence is clearly sufficient to support the jury's verdict.

### C.

■ DeGeorge next argues that all five perjury convictions must be reversed because the allegedly false statements were not material to the civil case in which they were made. *See United States v. Leon–Reyes*, 177 F.3d 816, 819 (9th Cir.1999) ("In a perjury case, the government must prove that the statement made by the defendant in the prior tribunal and alleged to be false was material.")

■ "A statement is material if it has a natural tendency to influence, or was capable of influencing, the decision of the decision-making body to which it was addressed." *Id.* at 820 (internal quotation marks omitted). The jury must decide, and was instructed to decide here, whether an allegedly false statement is "material." *See Johnson v. United States*, 520 U.S. 461, 465, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997).

DeGeorge has not cited, nor have we found, any cases holding that the district court's failure to specifically define "material" in the jury instructions constitutes error. Thus, DeGeorge's observation that the district court did not specifically instruct the jury on the definition of "material" does little to support his appeal of the sufficiency of the evidence, particularly where he did not challenge the jury instruction to the court below and does not specifically raise an instruction–related argument here.

The allegedly perjurious testimony arose in the context of the civil suit brought by Cigna against Polaris Pictures, DeGeorge, and others seeking rescission of the insurance contract. DeGeorge argues that the alleged perjury was immaterial to the civil case because the civil case was for rescission of the contract based on failure to disclose facts in the insurance application; Cigna did not assert that DeGeorge made a fraudulent claim for the loss of the *Principe. See Cigna Prop. & Cas. Ins. v. Polaris Pictures*, 159 F.3d 412, 419–20 (9th Cir. 1998).

DeGeorge's argument is misguided. The fact that the Libovich story was not the basis upon which to rescind the contract does not mean that the Libovich story was not *relevant* to the issue of rescission or that it had no tendency to influence the decision-maker in the civil trial. Instead, the implausibility of the Libovich story was relevant to show that DeGeorge had ulterior motives from the outset of his relationship with Cigna, including his intent to scuttle the yacht and to deliberately conceal his ownership interest and prior losses in applying for insurance. In fact, we observe that DeGeorge himself offered the Libovich story as part of his defense, thus indicating his belief in the story's materiality. Viewing the evidence in the light most favorable to the government, we conclude that sufficient evidence existed to support the jury's verdict that the allegedly false statements were material to the civil trial in which they were made.

### D.

■ Polaris Pictures filed a summary judgment motion in the civil case on February 15, 1996, and attached a copy of a proof of loss that recited the Libovich story and had been sent by Ebeling (on be-

half of Polaris) to Cigna three years earlier. Count Four of DeGeorge's indictment alleged that he had caused the mailing of this attached proof of loss in furtherance of his scheme to defraud Cigna. DeGeorge argues that the attachment of the proof of loss to the summary judgment motion is insufficient to sustain a mail fraud conviction because he did not actually cause it to be mailed and, in any event, it was not in furtherance of his allegedly fraudulent scheme.

We conclude that the evidence adduced at trial was sufficient to establish the two general elements of mail fraud: first, that DeGeorge devised or intended to devise a scheme to defraud Cigna and second, that DeGeorge made use of or caused use of the mails in executing his scheme. *See United States v. Lo,* 231 F.3d 471, 475 (9th Cir.2000). DeGeorge vehemently argues that because the Libovich story was not the basis upon which Cigna sought to rescind his insurance contract, the recitation of the Libovich story in the proof of loss did nothing to further his alleged fraudulent scheme. We are unpersuaded. Polaris, which was controlled by DeGeorge, would have been entitled to recover the full amount due under the insurance policy if the district court in the civil case had granted its summary judgment motion. *See also Cigna Prop. & Cas. Ins.,* 159 F.3d at 419 ("The [district] court also determined that if Cigna failed in its rescission claim, Polaris would be entitled to the benefits of the insurance contract ...."). Because the attachment of the proof of loss was intended to support his summary judgment motion and therefore aid him in recovering money from Cigna, the mailing was clearly in furtherance of the fraudulent scheme.

■ DeGeorge also argues that an attorney for Polaris, and not DeGeorge himself, mailed the proof of loss. While this may be true, the government presented evidence at trial to show that DeGeorge prepared the proof of loss, obtained Ebeling's signature, and otherwise controlled the litigation on behalf of Polaris. This is sufficient to support the jury's verdict that DeGeorge caused the use of the mails in executing his scheme.

## VI.

We next consider DeGeorge's evidentiary challenges. The district court allowed the government to introduce evidence that DeGeorge had previously lost three insured vessels at sea. The court reasoned that the prior losses were "inextricably intertwined" with the facts giving rise to the indictment against DeGeorge and therefore admissible without regard to Rule 404(b) of the Federal Rules of Evidence. In particular, the court believed the prior loss history was necessary to assist the jury in understanding why DeGeorge had maneuvered to distance himself from the boat's ownership and also to understand the context of the civil trial in which DeGeorge allegedly perjured himself. The court did not permit the government to introduce evidence that DeGeorge had collected insurance proceeds on those vessels or to discuss any further details surrounding those incidents.

■ We first must determine under a *de novo* standard of review whether the contested evidence falls within the scope of Rule 404(b). *See United States v. Rrapi,* 175 F.3d 742, 748 (9th Cir.1999). If so, we proceed to the four-part balancing test for determining admissibility under Rule 404(b), *see United States v. Romero,* 282 F.3d 683, 688 (9th Cir.), *cert. denied,* 537 U.S. 858, 123 S.Ct. 228, 154 L.Ed.2d 96 (2002); if not, we review the district court's decision to admit the evidence for an abuse of discretion under Rule 403, *see United States v. Lillard,* 354 F.3d 850, 853 (9th Cir.2003).

■ We have recognized two categories of evidence that may be considered "inextricably intertwined" with a charged offense and therefore admitted without regard to Rule 404(b). *See United States v. Vizcarra–Martinez,* 66 F.3d 1006, 1012 (9th Cir.1995). First, evidence of prior acts may be admitted if the evidence "constitutes a part of the transaction that serves as the basis for the criminal charge." *Id.* Second, prior act evidence may be admitted "when it was necessary to do so in order to permit the prosecutor to offer a coherent and comprehensible story regarding the commission of the crime." *Id.* at 1012–13.

■ Contrary to the government's assertion, the evidence of DeGeorge's prior marine losses does not appear to fit into the first category. The prior losses are too far removed in both time and circumstance to be linked with the alleged fraud in this case as part of a "single criminal episode." *Lillard,* 354 F.3d at 854.

■ The prior loss evidence does, however, fit into the second category. The concealment of DeGeorge's prior losses had an important factual connection to several counts contained in the indictment, including the conspiracy count. The government specifically alleged that DeGeorge's scheme included sham transactions to hide his ownership of the boat and concealment of his loss history on the insurance application. The government presented evidence, including Ebeling's testimony, to support this allegation. The jury would not have understood the relevance of the transactions and concealment without hearing at least some explanation for why DeGeorge could not obtain insurance in his own name. *See Vizcarra–Martinez,* 66 F.3d at 1013 ("The jury cannot be expected to make its decision in a void— without knowledge of the time, place, and circumstances of the acts which form the basis of the charge.") (alteration and inter-

nal quotation marks omitted). Thus, the district court did not err in concluding that the prior loss evidence was "inextricably intertwined" with the underlying offense.

Moreover, the district court's limitations on the evidence are sufficient to convince us that the court did not abuse its discretion under Rule 403. *See, e.g., United States v. Beckman,* 298 F.3d 788, 794 (9th Cir.2002) (district court's monitoring of other acts evidence supports satisfaction of Rule 403 test). While we agree with DeGeorge that the prior loss evidence could imply a propensity to defraud insurance companies, the district court prevented the government from presenting evidence that DeGeorge had collected under the previous insurance policies. Instead, the court limited the use of the prior loss evidence to correspond with the issue to which it was relevant: DeGeorge's non-disclosure of prior losses. The court's conclusion that the probative value of this limited evidence outweighed the danger of unfair prejudice was not an abuse of discretion.

Because we conclude that the evidence of prior losses is "inextricably intertwined" with the charges in the indictment, we need not consider its admissibility under Rule 404(b).

## VII.

DeGeorge challenges several aspects of his sentence, including the calculation of the base offense level, the application of various enhancements, and the restitution order. He initially made these challenges under the assumption that the federal Sentencing Guidelines were constitutionally valid, but has since submitted a supplemental citation to *Blakely v. Washington,* 542 U.S. ——, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), which recently called that assumption into question. Because we reverse on other grounds, we will not address the *Blakely* issues here; instead,

DeGeorge is free to raise them on remand.[7]

### A.

■ We first review the restitution order made by the district court pursuant to the Victim and Witness Protection Act ("VWPA"), 18 U.S.C. §§ 3663–64, which is unaffected by *Blakely*. *See, e.g., United States v. Baker*, 25 F.3d 1452, 1456 (9th Cir.1994) ("[R]estitution determinations under the VWPA are quite different from sentencing determinations under the Sentencing Guidelines."). We review the legality of a restitution award *de novo*, *see United States v. Stoddard*, 150 F.3d 1140, 1147 (9th Cir.1998), and the award itself for an abuse of discretion, *see United States v. Johnson*, 132 F.3d 1279, 1286 (9th Cir.1997).

■ The district court ordered DeGeorge to pay restitution of $2,872,634.89 to Cigna, which was the amount of attorney's fees incurred by Cigna in defending the civil case. DeGeorge argues that the award must be reversed because the attorney's fees were not a direct result of the conduct for which DeGeorge was convicted. *See United States v. Gamma Tech. Indus., Inc.*, 265 F.3d 917, 927 (9th Cir. 2001) (restitution proper only for losses directly resulting from defendant's offense).

The district court's award is similar to an award reversed by *United States v. Barany*, 884 F.2d 1255 (9th Cir.1989). The defendant in *Barany* was convicted of three counts of mail fraud based on her filing of a fraudulent insurance claim. The insurance company paid an initial advance on her claim, but ultimately became suspicious and withheld further payments. The defendant filed a civil action against the company alleging breach of contract and bad faith. The district court's criminal restitution order included the amount incurred by the insurance company in defending that civil claim. We reversed, concluding that the attorney's fees in the civil case were too remote from the defendant's criminal conduct to serve as a basis for restitution. *Id.* at 1261. The court explained: "In this case, the amount of resources[the insurance company] chose to expend in defending the civil suit is only tangentially related to the defendant's original offenses." *Id.*

Despite the similarity, *Barany* is not controlling. The charges in that case were limited to mail fraud, and the civil trial was merely an eventual consequence of that fraud. By contrast, DeGeorge was convicted of conspiracy that included his perjury and other conduct during the civil trial as overt acts. Thus, the insurance company's expenses in the civil trial were *directly*, not tangentially, related to DeGeorge's offenses. *See United States v. Reed*, 80 F.3d 1419, 1423 (9th Cir.1996) ("Under [§ 3663], when someone is convicted of a crime that includes a scheme, conspiracy, or pattern of criminal activity *as an element of the offense*, the court can order restitution for losses resulting from any conduct that was part of the scheme, conspiracy, or pattern of criminal activity."); *United States v. Blackburn*, 9 F.3d

---

7. We assume that, in addition to *Blakely* itself, the district court will find guidance in this court's recent opinion, *United States v. Ameline*, 376 F.3d 967 (9th Cir.2004) (applying *Blakely* to federal Sentencing Guidelines after concluding that *sua sponte* review of *Blakely* issues was appropriate). Perhaps more importantly, we observe that the Supreme Court has recently granted petitions for certiorari in *United States v. Booker*, 375 F.3d 508 (7th Cir.2004), *cert. granted*, 2004 WL 1713654 (U.S. Aug.2, 2004) (No. 04–104), and *Fanfan v. United States*, No. 03–47, 2004 WL 1723114 (D.Me. June 28, 2004), *cert. granted*, 2004 WL 1713655 (U.S. Aug.2, 2004) (No. 04–105), and has scheduled those cases for October 4, 2004, the first day of the Court's next session.

353, 358–59 (5th Cir.1993) (affirming district court's inclusion of attorney's fees from a civil suit in the calculation of loss for sentencing purposes because the fees were a direct result of the offense).

Because we conclude that the attorney's fees incurred in the civil case were a direct result of DeGeorge's criminal conduct, we affirm the district court's restitution award.

### B.

We next address an upward adjustment under the Sentencing Guidelines that does not implicate *Blakely* but nonetheless must be reversed.[8] The district court relied on U.S.S.G. § 3C1.1, cmt. n. 8 (2000), in making a two-level upward adjustment for obstruction of justice based on the jury's guilty verdict on the perjury charges. Section 3C1.1 states:

> If (A) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the course of the investigation, prosecution, or sentencing of the instant offense of conviction, and (B) the obstructive conduct related to (i) the defendant's offense of conviction and any relevant conduct; or (ii) a closely related offense, increase the offense level by 2 levels.

Note 8 of the commentary to that section states:

> If the defendant is convicted both of an obstruction offense ... and an underlying offense (the offense with respect to which the obstructive conduct occurred), the count for the obstruction offense will be grouped with the count for the under-

lying offense under subsection (c) of § 3D1.2 (Groups of Closely Related Counts). The offense level for that group of closely related counts will be the offense level for the underlying offense increased by the 2–level adjustment specified by this section, or the offense level for the obstruction offense, whichever is greater.

(Citations omitted.)

■ The district court's interpretations of the Sentencing Guidelines are reviewed *de novo*. *United States v. Allen,* 341 F.3d 870, 892 (9th Cir.2003), *cert. denied,* — U.S. ——, 124 S.Ct. 1876, 158 L.Ed.2d 471 (2004). The application of the Sentencing Guidelines to the facts of a particular case is reviewed for abuse of discretion. *Id.*

■ The district court erred in relying on Note 8 because DeGeorge's perjury occurred during the *civil* trial as part of his scheme to defraud and not during the *criminal* investigation as part of an attempt to obstruct justice. Thus, the perjury was not an "obstruction offense" at all and should not have been grouped with the other offenses under § 3D1.2(c).[9] In fact, because the civil trial occurred before the criminal investigation of DeGeorge began, the district court's characterization of the perjury as an "obstruction offense" served only to make Note 8 inconsistent with the text of § 3C1.1 itself, which requires the perjury to occur "*during* the course of the [criminal] investigation." *See United States v. Powell,* 6 F.3d 611, 614 (9th Cir. 1993) (concluding that the district court must ignore the note and apply the Guideline whenever the two are inconsistent).

---

8. We are, of course, bound by the conclusion in *Ameline,* 376 F.3d at 981, that the Sentencing Guidelines are severable, and therefore we must continue to apply the Sentencing Guidelines whenever constitutionally permissible.

9. DeGeorge's offenses likely should have been grouped under § 3D1.2(b), which calls for the grouping of counts that "involve the same victim and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan."

 

The weakness of the government's position is perhaps best illustrated by the case on which it relies to support the enhancement. The government cites *United States v. Briscoe,* 65 F.3d 576 (7th Cir. 1995), as an example of a situation where a court applied what is now Note 8 to § 3C1.1 even though the alleged obstruction was also a separate charge. However, the court in *Briscoe* affirmed the sentence only after specifically concluding that the obstruction occurred *during* the criminal investigation. *Id.* at 592 ("The record contains sufficient evidence to support the determination that Mr. Briscoe destroyed union records *after a criminal investigation was initiated,* therefore impeding the investigation and prosecution of the case.") (emphasis added).

The government complains that "not applying the enhancement would unfairly benefit defendant by effectively eliminating any sentencing repercussions for his perjury offenses, as the obstruction and other offenses would all group together, but there would be no additional two-level enhancement." Whether this fear is well-founded will depend on the outcome of DeGeorge's resentencing. Nonetheless, there is nothing "unfair" about it; indeed, the Guidelines specifically acknowledge this possibility. *See* U.S.S.G. § 3D1.3, cmt. n. 4 ("Sometimes the rule specified in this section may not result in incremental punishment for additional acts because of the grouping rules."). The government persuasively worked to portray the perjury as part of the fraudulent scheme in order to protect itself from possible statute of limitations problems, *see supra* §§ III–IV. It cannot now abandon this approach simply to obtain a higher sentence. We reverse the two-level enhancement for obstruction of justice.

### C.

The remainder of DeGeorge's sentencing challenges are without merit under the law of this circuit before *Ameline.*

However, as we have explained, we must remand so that the district court may reconsider the grouping of DeGeorge's offenses. When the district court resentences DeGeorge, we are confident it will do so in accordance with extant law on sentencing.

### VIII.

In sum, we AFFIRM DeGeorge's convictions in all respects but REMAND for resentencing consistent with this opinion.