**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Michael C. MILLER,**
**Defendant-Appellant.**

**No. 87–5092.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Sept. 10, 1987.

Decided Oct. 22, 1987.

John S. Crouchley, Los Angeles, Cal., for defendant-appellant.

Janet L. Goldstein, Washington, D.C., for plaintiff-appellee.

Before HALL, NOONAN and THOMPSON, Circuit Judges.

NOONAN, Circuit Judge:

Michael C. Miller entered a conditional plea of guilty to the crime of wire fraud, 18 U.S.C. § 1343. He reserved his right to appeal on the grounds that the count was time-barred and that evidence admitted under 18 U.S.C. § 3292, whose constitutionality he challenged, should be suppressed. The issues raise new points of law about parts of the Comprehensive Crime Control Act of 1984. Miller's contentions have been vigorously argued and as vigorously answered. We affirm the district court and Miller's conviction.

## FACTS

In 1978 Miller, a real estate dealer in Los Angeles, became a friend of John Louis Paanakker, a young man of twenty-one, who had recently moved from Germany to California. Paanakker was about to receive a large inheritance in stocks. Miller convinced him he should invest the inheritance in the Grand Cayman Islands. In July 1980 Miller traveled to the Grand Caymans and set up a company called Humberstone, Hatfield & Co., Inc. (HHC) and opened an account for HHC at the Bank of Nova Scotia Trust Co., Ltd. in the Grand Caymans. Miller told Paanakker that Paanakker would be the only person who could withdraw money from the corporate account; in fact Miller also had authority over the account.

In September 1980 Miller and Paanakker arranged to sell the stock Paanakker had received as an inheritance, realizing $1,135,533 from the sale. Paanakker gave Miller a check in this amount in favor of HHC. Miller told Paanakker that he had wired the money to HHC's account with the Bank of Nova Scotia and that bearer bonds had been bought with the money. In December 1980 Miller told Paanakker that he, Miller, had received the bonds but that a burglar had stolen them from Miller's home. In fact in early October 1980 Miller had sent a cable from California to Barclays Bank International in the Grand Caymans, transmitting the $1,135,533 to his own account. He then instructed Barclays to transfer the money to another account in his name at Creditanstalt-Bankverein, Vienna, Austria. From there the money was transferred at his direction to accounts in his name at Nordfinanz-Bank and Bank Lev, Zurich, Switzerland. Paanakker was of course unaware of these maneuvers but was left without his inheritance.

## PROCEEDINGS

In 1982 Paanakker reported his suspicions of Miller to the Federal Bureau of Investigation. A grand jury investigated what had happened to the money, and it became necessary to get the records of the foreign banks involved. On September 9, 1983 the government asked for the records of Barclays and the Bank of Nova Scotia in the Grand Caymans; the request was granted on February 13, 1984. It then became clear that a transfer had been made to the Vienna bank. Its records were requested on July 25, 1985; the request was granted November 28, 1984 and the documents received on December 26, 1984. The transfer to Switzerland then became evident and on February 25, 1985 a request for the Swiss records was made; the request was granted August 26, 1985.

On July 17, 1985 the government applied for an order from the district court suspending the statute of limitations for the nine month period during which official requests for foreign evidence in the Grand Caymans and Austria had been pending. Under 18 U.S.C. § 3292 the application was granted. On November 20, 1985 the government applied for, and received, a similar suspension for the six month period its request for foreign evidence from Switzerland had been pending.

On April 3, 1986 the grand jury returned a four-count indictment. Miller entered his conditional guilty plea to Count One, charging wire fraud, in the October 8, 1980 wiring of Paanakker's money to his own account. Miller appeals on grounds now to be examined.

## ANALYSIS

■ *The Date Section 3292 Became Applicable.* On October 12, 1984 Congress enacted the Comprehensive Crime Control Act of 1984, of which 18 U.S.C. § 3292 forms a part. Miller contends that the statute applies only to offenses committed after the date of its enactment. If the statute does not apply, prosecution for Miller for an offense committed in October 1980 is barred because, "Except as otherwise expressly provided by law, no person shall be prosecuted ... for any offense ... unless the indictment is found ... within five years next after such offense shall have been committed." 18 U.S.C. § 3282

Miller's argument is that the new statute, section 3292, is not an express provision of law. He invokes the general principles that criminal statutes of limitations are to be interpreted in favor of repose and that a law is presumed to operate prospectively in the absence of a clear expression to the contrary. *United States v. Richardson*, 512 F.2d 105 (3rd Cir.1975).

Miller's argument, ingenious as it is, misconceives the issue. The new statute was not applied by the district court retroactively. The statute was in effect when the district court orders were entered suspending the statute of limitations. The district court simply applied the law in force. *See Bradley v. Richmond School Board*, 416 U.S. 696, 711, 94 S.Ct. 2006, 2016, 40 L.Ed. 2d 476 (1974). There was, of course, no "manifest injustice," *see id.*, in the suspension of the statute of limitations to enable the government to catch lawbreakers

whose crimes have foreign connections. As for the new statute not being an express provision of law, what could be more express than a statute specifically authorizing a district court to extend the ordinary period of limitations? Miller's attempt to make section 3292 apply only to crimes committed after November 12, 1984 fails.

*Application of Section 3292 After the Foreign Evidence Has Been Recovered.* Miller next contends, with equal ingenuity, that the government's application to suspend the statute of limitations under section 3292 must be made while the evidence is still abroad—that, in other words, the government cannot get the evidence and then apply for the suspension. Miller puts great stress on the words of section 3292(a)(1) "Upon application of the United States, filed before return of an indictment, indicating that evidence of an offense *is* in a foreign country, the district court ... shall suspend the running of the statute...." 18 U.S.C. § 3292(a)(1) (emphasis supplied).

■ Miller of course has a point, and if statutory construction could be decided by inspection of a single word, it might even be a winning point. But statutory construction is not so simple. The statute itself specifies the only relevant time the application must be made: "before return of an indictment." *Id.* The statute then goes on to say that the district court shall grant the application if "it reasonably appears, or reasonably appeared at the time the request was made, that such evidence is, or was, in such foreign country." *Id.* The "was" here plainly indicates that Congress set no store upon the evidence still being abroad as a precondition for granting the application. Nor would it make sense of the statute to read in such a requirement. The statute makes better sense if it is read as three district judges here have construed it to let the government file the application after it has sifted the foreign evidence sought. The statute was properly applied to Miller.

*The Constitutionality of Section 3505.* Finally, Miller attacks the constitutionality of another section of the Comprehensive Crime Control Act, 18 U.S.C. § 3505, which provides as follows:

(a)(1) In a criminal proceeding in a court of the United States, a foreign record of regularly conducted activity, or a copy of such record, shall not be excluded as evidence by the hearsay rule if a foreign certification attests that—

(A) such record was made, at or near the time of the occurrence of the matters set forth, by (or from information transmitted by) a person with knowledge of those matters;

(B) such record was kept in the course of a regularly conducted business activity;

(C) the business activity made such a record as a regular practice; and

(D) if such record is not the original, such record is a duplicate of the original; unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness.

(2) A foreign certification under this section shall authenticate such record or duplicate.

(b) At the arraignment or as soon after the arraignment as practicable, a party intending to offer in evidence under this section a foreign record of regularly conducted activity shall provide written notice of that intention to each other party. A motion opposing admission in evidence of such record shall be made by the opposing party and determined by the court before trial. Failure by a party to file such motion before trial shall constitute a waiver of objection to such record or duplicate, but the court for cause shown may grant relief from the waiver.

(c) As used in this section, the term—

(1) "foreign record of regularly conducted activity" means a memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, maintained in a foreign country;

(2) "foreign certification" means a written declaration made and signed in a foreign country by the custodian of a

foreign record of regularly conducted activity or another qualified person that, if falsely made, would subject the maker to criminal penalty under the law of that country; and

(3) "business" includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit.

18 U.S.C. § 3505.

Miller's claim is that the statute violates the Confrontation Clause of the Sixth Amendment. He relies principally on *United States v. McClintock*, 748 F.2d 1278 (9th Cir.1984), *cert. denied* 474 U.S. 822, 106 S.Ct. 75, 88 L.Ed.2d 61 (1985) and *United States v. Ordonez*, 737 F.2d 793, (9th Cir. 1984).

■ The Confrontation Clause establishes "a preference for face-to-face confrontation at trial," but not an absolute requirement that would exclude all hearsay. *Ohio v. Roberts*, 448 U.S. 56, 63, 100 S.Ct. 2531, 2537, 65 L.Ed.2d 597 (1980). If the declarant is unavailable, his declaration is not constitutionally inadmissible if it bears "indicia of reliability." *Id.* at 65–66, 100 S.Ct. at 2538–39.

In *McClintock*, 748 F.2d at 1292, the government failed to show the unavailability of the gem evaluators whose evaluation of quality went to the heart of the case. In *Ordonez*, 737 F.2d at 802, the government could not identify the authors of the ledger entries it sought to rely on and did not show that the authors were unavailable. Here we deal with foreign recordkeepers who are unavailable at trial. *Cf. Mancusi v. Stubbs*, 408 U.S. 204, 212, 92 S.Ct. 2308, 2312–13, 33 L.Ed.2d 293 (1972).

■ The issue then is whether the bank records here sought to be admitted under section 3505 against the defendant bear the indicia of reliability. The Bank of Zurich records are accompanied by a statement made under criminal penalty for falsity before the Public Prosecutor for the District of Zurich by Charles Zurrer, vice director of the bank. Zurrer certifies the authenticity and accuracy of the records and that they were kept in the ordinary course of

business and prepared at or around the time the events occurred by a person familiar with those matters or on the basis of information given by such a person. A similar attestation before the Public Prosecutor was made as to the Bank Lev records by Silvia Fruhwirt, legal assistant at that bank. Similar attestations were made before a magistrate by Eric Cautchey, manager of the Georgetown, Grand Cayman Branch of Barclay's Bank; before a notary public by Frank White, assistant manager of the Bank of Nova Scotia Trust Company (Cayman) Limited; and before a judge of the Criminal District Court of Vienna by Johannes Kaiser, an employee of the Creditanstalt-Bankverein.

■ While having the attestation made before a judge or public prosecutor is much to be preferred by reason of its solemnity to the practice of swearing before a notary public, and while a high bank officer is to be preferred to a simple "employee," we do not in this case find reason to distinguish among the records introduced into evidence. All bear indicia of reliability. The admission of business records is a firmly-rooted exception to the hearsay rule. *See Roberts*, 448 U.S. at 66 n. 8, 100 S.Ct. at 2539 n. 8; *United States v. Bernard S.*, 795 F.2d 749, 755 n. 8 (9th Cir.1986). Firmly-rooted exceptions to the hearsay rule do not offend the Confrontation Clause. *Bourjaily v. United States*, ── U.S. ──, 107 S.Ct. 2775, 2783, 97 L.Ed.2d 144 (1987).

Banks depend on keeping accurate records and although, as we all know, they err occasionally, their records are among the most common type of business record routinely used in our courts. The novelty of the statute is to admit the records without confrontation by the defendant with the recordkeepers. No motive is suggested that would lead bank officials to change, distort, or manipulate the records at issue here. The recordkeepers have, under criminal penalties in their own countries, asserted that the records are records kept in the course of business. Examination of the recordkeepers by counsel for Miller could not reasonably be expected to establish anything more or less than that. If the

records were in fact inaccurate, it was within Miller's power to depose the record-keepers and challenge the records. Precedent in and out of this circuit points to admissibility here. *See, e.g., United States v. Leal,* 509 F.2d 122 (9th Cir.1975); *United States v. Davis,* 767 F.2d 1025, 1031–32 (2nd Cir.1985). As applied in Miller's case to admit foreign bank records kept in the course of business, section 3505 is constitutional.

AFFIRMED.