**UNITED STATES of America, Appellant**

v.

**George ATIYEH**

**United States of America**

v.

**George Atiyeh, Appellant.**

**Nos. 03–1472, 03–1746, 03–1757.**

United States Court of Appeals,
Third Circuit.

Argued Oct. 5, 2004.

March 24, 2005.

Paul Mansfield (Argued), Office of United States Attorney, Philadelphia, PA, for Appellant United States in Nos. 03–1472, 03–1757, Appellee United States in No. 03–1746.

Frank A. Labor, III, Office of United States Attorney, Philadelphia, PA, for Appellant United States in No. 03–1757, Appellee United States in No. 03–1746.

Peter Goldberger (Argued), Law Office of Peter Goldberger, Ardmore, PA, for Appellant George Atiyeh in No. 03–1746, Appellee George Atiyeh in Nos. 03–1472, 03–1757.

Before SLOVITER, BECKER, and STAPLETON, Circuit Judges.

OPINION OF THE COURT

SLOVITER, Circuit Judge.

This case involves an off-shore betting operation. Appellant George Atiyeh was convicted by a jury in the United States District Court for the Eastern District of Pennsylvania of conspiracy to operate a gambling business, conspiracy to utilize wire communications to transmit information concerning bets, money laundering, and substantive gambling offenses. In his direct appeal, Atiyeh contends that the District Court erred by denying his pre-trial motion to dismiss certain counts of the indictment as barred by the statute of limitations. He further argues that a new trial is required because the remaining counts were tainted by the dismissed counts.

The Government cross appeals from the District Court's grant of Atiyeh's post-conviction motion for acquittal on the counts that were predicated on a violation of 18 U.S.C. § 1955 (prohibiting illegal gambling businesses). It also appeals from the District Court's grant of a two-level downward adjustment in Atiyeh's sentence for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1.

Atiyeh's direct criminal appeal was consolidated with the two Government appeals. The District Court had subject matter jurisdiction under 18 U.S.C. § 3231. We have jurisdiction to hear Atiyeh's direct criminal appeal under 28 U.S.C. § 1291. We have jurisdiction over the Government's cross appeal of the judgment of acquittal under 18 U.S.C. § 3731 and of the sentence imposed under 18 U.S.C. § 3742.

I.

*Factual and Procedural Background*

At trial, the Government presented evidence that from November 1995 through

January 1997, George Atiyeh operated an unlicensed sports-gambling business known as International Casino ("IC"). Although IC purported to be an "off shore" business operating solely in Antigua, substantial portions of its operations were also located in Quebec, Canada and Allentown, Pennsylvania.

IC was an account bookmaking operation. Customers who wished to open a sports-wagering account to place bets on the outcome of a wide variety of sports matches, such as the Super Bowl, professional basketball games, and similar events, would wire an initial deposit to a bank account in Antigua controlled by Atiyeh. Atiyeh would then transfer those funds to a bank account in Allentown, Pennsylvania, which he also controlled. The accumulated funds were used to pay IC's business expenses and to pay the successful bettors. To make these payouts, Atiyeh or another IC employee would cash checks drawn on the Allentown bank account and purchase money orders from banks and post offices in the Allentown area which they would then mail to the successful bettors. Often, the envelopes used to mail payouts bore an Antiguan return address but a Pennsylvania postmark.

IC used several telephone lines to accept bets and provide betting information to callers from various United States locations. Typically, IC's customers placed their wagers over toll-free lines that were then forwarded to IC employees in Quebec, Canada. On some occasions when employees in Quebec were unavailable, calls were forwarded to and answered by IC employees in Allentown.

In 1996, the Federal Bureau of Investigation ("FBI") began an undercover investigation of IC. Between September 12, 1996 and December 12, 1996, Special Agent Raymond R. Manna, assuming the role of a bettor, opened an account with IC, placed bets, and requested payouts. On December 17, 1996, the Government obtained a search warrant to search the building at 727 North Meadow Street, Allentown, Pennsylvania, where IC operated. This search resulted in the seizure of a number of IC documents, including banking and telephone records of the betting operation.

A grand jury sitting in the Eastern District of Pennsylvania returned a fifteen count sealed indictment against Atiyeh on December 12, 2001. Count One charged that between November 1995 and January 1997, Atiyeh conspired with unnamed individuals, in violation of 18 U.S.C. § 371,[1] to violate 18 U.S.C. § 1084[2] by using wire communication facilities in foreign commerce to transmit information concerning bets and wagers on sporting events, and to violate 18 U.S.C. § 1955 by conducting a gambling business. Count Two charged

---

**1.** 18 U.S.C. § 371 provides in pertinent part:

If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years, or both.

**2.** 18 U.S.C. § 1084(a) provides:

Whoever being engaged in the business of betting or wagering knowingly uses a wire communication facility for the transmission in interstate or foreign commerce of bets or wagers or information assisting in the placing of bets or wagers on any sporting event or contest, or for the transmission of a wire communication which entitles the recipient to receive money or credit as a result of bets or wagers, or for information assisting in the placing of bets or wagers, shall be fined under this title or imprisoned not more than two years, or both.

that Atiyeh violated 18 U.S.C. § 1955 by conducting a gambling business during the same period.

Counts Three through Seven charged Atiyeh with violating 18 U.S.C. § 1084 based on five telephone calls made by FBI Agent Manna to IC. Those calls were made on September 12, October 9 and 16, November 29, and December 12, 1996. Count Eight charged a conspiracy, also continuing from November 1995 until January 1997, in violation of 18 U.S.C. § 1956(h),[3] between Atiyeh and unnamed individuals, to conduct financial transactions with the proceeds of the gambling business, in violation of 18 U.S.C. § 1956(a)(1),[4] and to transfer funds with the intent of promoting the gambling business, in violation of 18 U.S.C. § 1956(a)(2).[5]

Counts Nine through Fifteen charged substantive crimes of money laundering in violation of 18 U.S.C. § 1956(a)(2) based on the transmission of funds from a bank in Antigua to an account in Allentown, Pennsylvania, on various dates from October 25, 1996 through November 29, 1996. Finally the indictment contained a notice of money laundering forfeiture pursuant to 18 U.S.C. § 982.

Atiyeh was arrested on the indictment on December 19, 2001, and released on bail. Thereafter, he filed a pretrial motion to dismiss Counts Three through Six and Counts Nine through Fifteen, as barred by the five-year statute of limitations set forth in 18 U.S.C. § 3282. Each count charged conduct that had occurred more than five years prior to the return of the indictment. The District Court judge denied the motion in an order dated May 30, 2002. The trial was held from September 9 to September 19, 2002, and Atiyeh was convicted

---

3. 18 U.S.C. § 1956(h) provides:

 Any person who conspires to commit any offense defined in this section or section 1957 shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy.

4. 18 U.S.C. § 1956(a)(1) provides:

 Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity—
 (A) (i) with the intent to promote the carrying on of specified unlawful activity; or
 (ii) with intent to engage in conduct constituting a violation of section 7201 or 7206 of the Internal Revenue Code of 1986; or
 (B) knowing that the transaction is designed in whole or in part-
 (i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity; or
 (ii) to avoid a transaction reporting requirement under State or Federal law,

shall be sentenced to a fine of not more than $500,000 or twice the value of the property involved in the transaction, whichever is greater, or imprisonment for not more than twenty years, or both.

5. 18 U.S.C. § 1956(a)(2) provides:

 Whoever transports, transmits, or transfers, or attempts to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States—
 (A) with the intent to promote the carrying on of specified unlawful activity; or
 (B) knowing that the monetary instrument or funds involved in the transportation, transmission, or transfer represent the proceeds of some form of unlawful activity and knowing that such transportation, transmission, or transfer is designed in whole or in part—
 (i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity; or
 (ii) to avoid a transaction reporting requirement under State or Federal law, shall be [guilty of an offense].

by the jury on all fifteen counts. Thereafter, the District Court granted Atiyeh's motion for judgment of acquittal under Federal Rule of Criminal Procedure 29(c) as to Counts Two (operating an illegal gambling business), Eight through Fifteen (money laundering), and Count One, to the extent that it charged a conspiracy to conduct a gambling business.

At the sentencing hearing on the remaining counts (the remainder of Count One and Counts Three through Seven), the District Court awarded Atiyeh a two-level downward adjustment for acceptance of responsibility. Atiyeh was sentenced to fifteen months imprisonment, supervised release for two years, a $4,000 fine, and $600 in special assessments. This timely appeal followed.

## II.

### *Statute of Limitations*

█ It is evident that the indictment, returned by the grand jury on December 12, 2001, charged conduct in Counts Three through Six and Nine through Fifteen[6] that occurred outside the five-year statute of limitations period prescribed by 18 U.S.C. § 3282.[7] Atiyeh filed a motion asking the District Court to dismiss these counts as time-barred. In its response to the motion, the Government revealed that on October 5, 2001, it had filed an *ex parte* application under 18 U.S.C. § 3292 with the Grand Jury Supervising Judge,[8] who entered the requested order *ex parte* on the same day. That order suspended the statute of limitations for several periods of time on the ground that evidence was sought from foreign countries.

In pertinent part the statute pursuant to which the judge entered the order provides that:

(a)(1) Upon application of the United States, filed *before* return of an indictment, indicating that evidence of an offense *is* in a foreign country, the district court before which a grand jury is impaneled to investigate the offense shall suspend the running of the statute of limitations for the offense if the court finds by a preponderance of the evidence that an official request *has* been made for such evidence and that it reasonably appears, or reasonably appeared at the time the request was made, that such evidence *is, or was*, in such foreign country.

(2) The court shall rule upon such application not later than thirty days after the filing of the application.

(b) Except as provided in subsection (c) of this section, a period of suspension under this section shall begin on the date on which the official request is made and end on the date on which the foreign court or authority takes final action on the request.

(c) The total of all periods of suspension under this section with respect to an offense—

---

**6.** Counts Three through Six charged violations of 18 U.S.C. § 1084 based on conduct which occurred on September 12, October 9 and 16, and November 29, 1996. Counts Nine through Fifteen charged violations of § 1956(a)(2) based on conduct which allegedly occurred on October 25 and 29, and November 12, 18, 19, 27, and 29.

**7.** 18 U.S.C. § 3282(a) provides:
Except as otherwise expressly provided by law, no person shall be prosecuted, tried, or punished for any offense, not capital, unless the indictment is found or the information is instituted within five years next after such offense shall have been committed.

**8.** To avoid confusion, we use the term "Grand Jury Supervising Judge" to refer to the judge before whom the grand jury was impaneled, and the term "District Court Judge" or "District Court" to refer to the trial court.

(1) shall not exceed three years; and

(2) shall not extend a period within which a criminal case must be initiated for more than six months if all foreign authorities take final action before such period would expire without regard to this section.

18 U.S.C. § 3292 (emphasis added).

In its application for suspension of the statute of limitations, the Government also revealed that it had received all the requested foreign evidence from Canadian and Antiguan authorities at least two months prior to its application, and in some instances as much as sixteen months before the application was made.[9]

As a result of this revelation, Atiyeh argued in his pretrial motion before the District Court that the statute of limitations should not have been suspended because the Government's application for suspension failed to comply with the plain language of 18 U.S.C. § 3292. Specifically, he claimed that at the time the Government made its application to the Grand Jury Supervising Judge to suspend the statute of limitations, the Government could not meet the statutory requirement that it "indicat[e] that evidence of an offense is in a foreign country...." 18 U.S.C. § 3292(a)(1).

The District Court reluctantly denied Atiyeh's motion to dismiss, stating that "I don't like this statute, but ... I think that the intent of Congress is clear and we have to go with it." Supp.App. at 315. The District Court issued a written order on May 29, 2002, denying Atiyeh's motion "for the reasons stated by the Court during

oral argument and by the United States Court of Appeals for the Ninth Circuit in *United States v. Miller*, 830 F.2d 1073, 1076 (9th Cir.1987)." Supp.App. at 87.

On appeal, Atiyeh reasserts his argument that the Government's application for suspension of the statute of limitations was facially invalid because it failed to comply with the literal language of § 3292(a)(1). He further argues that the findings of the Grand Jury Supervising Judge set forth in the order of October 5, 2001 were clearly erroneous as they were not supported by a preponderance of the evidence before him. Finally, Atiyeh contends that the counts that were not time-barred were prejudicially tainted by the evidence admitted with regard to the time-barred counts.

The Government contests each of these arguments, and asserts that even if the District Court erred in denying Atiyeh's pretrial motion to dismiss, the doctrine of equitable tolling should save the time-barred counts because the Government relied in good faith on the suspension order entered by the Grand Jury Supervising Judge.

## A.

### *Interpretation of 18 U.S.C. § 3292*

The issue before us is whether a district court may issue an order, under 18 U.S.C. § 3292, suspending the five-year statute of limitations in 18 U.S.C. § 3282, when the Government's application for suspension is filed *after* it has received all requested foreign evidence from foreign authorities (referred to in 18 U.S.C. § 3292(a)(2)(b) as

---

**9.** Evidence had been sought from Antigua on or about July 9, 1999, and compliance had been received by the Government on or about August 31, 2000. Further evidence was sought from Antigua on March 12, 2001, and provided on or about April 22, 2001. The first request to Canada for evidence is dated December 10, 1998. An additional request was made February 9, 2000. Canadian authorities complied with both requests on May 10, 2000. A supplemental request to Canada is dated April 2, 2001. Canadian authorities complied with this request on July 31, 2001.

the "final action"). Our review of a district court's legal determinations and its application of legal precepts to facts is plenary. *See Epstein Family P'ship v. Kmart Corp.*, 13 F.3d 762, 766 (3d Cir. 1994); *see also Jones v. Morton*, 195 F.3d 153, 156 (3d Cir.1999); *United States v. Conley*, 4 F.3d 1200, 1204 (3d Cir.1993). We have found only two reported decisions on the issue presented here, both from the same court. *United States v. DeGeorge*, 380 F.3d 1203 (9th Cir.2004); *United States v. Miller*, 830 F.2d 1073 (9th Cir. 1987).

We conclude that the District Court's interpretation of § 3292 was erroneous as a matter of law. Because that error underlays the District Court's denial of Atiyeh's motion to dismiss Counts Three through Six and Nine through Fifteen of the indictment as time-barred, we will reverse.

■ There are three distinct events contemplated by § 3292 with regard to an order suspending the statute of limitations. Sequentially they are: (1) the Government's request to a foreign country for evidence located in that country (made under a Mutual Legal Assistance Treaty ("MLAT") [10] or similar international agreement); (2) the Government's application to the Grand Jury Supervising Judge to suspend the statute of limitations, which must be made "before [the] return of an indictment"; and (3) the Supervising Judge's action on the Government's application. 18 U.S.C. § 3292(a)(1).

Of significance to the issue before us, the Government must "indicat[e]" in its application to the Grand Jury Supervising Judge that as of the time the application is made, "evidence of an offense *is in* a foreign country" and that "an official request has been made for such evidence." *Id.* (emphasis added). Thereafter, the Grand Jury Supervising Judge must determine that it "reasonably appears" that evidence continues to be in a foreign country or that, at the time the Government made its application for suspension of the statute of limitations, evidence was in a foreign country. *Id.* The judge is authorized to order the suspension of the statute of limitations only if all the above conditions are satisfied.

The Government concedes that its application to the District Court to suspend the statutory period "did not precisely state that evidence of offenses 'is in a foreign country.'" Gov. Br. at 41. Nonetheless, it agrees with the District Court's ruling that under § 3292(a)(1) the Government's application for suspension need not aver that evidence "is" in a foreign country at the time the application for suspension is made, but need only aver that evidence "was" in a foreign country at some time in the past.

■ The District Court's interpretation was based on the fact that there are two references in § 3292(a)(1) to time. The Government, focusing on the phrase "is, or was" in the latter portion of § 3292(a)(1), argues that this creates an inconsistency in the statute. A careful

**10.** MLATs provide for a broad range of cooperation between the United States and foreign countries in criminal matters, including (1) the taking of testimony or statements of witnesses; (2) the provision of documents, records, and evidence; (3) the service of legal documents; (4) the location or identification of persons; (5) the execution of requests for searches and seizures; and (6) the provision of assistance in proceedings relating to the forfeiture of the proceeds of crime and the collection of fines imposed as a sentence in a criminal prosecution. *See United Kingdom v. United States*, 238 F.3d 1312, 1316–17 (11th Cir.2001) (citing Letter of Transmittal from the President of the United States to the Senate, Jan. 23, 1995).

reading makes apparent that there is no inconsistency. The "is" language in the beginning portion of the subsection refers solely to the averment the Government must make in its application to suspend the statute of limitations. The "is, or was" language in the latter portion of the subsection pertains not to the application by the Government to suspend the statute of limitations, but rather solely to the findings that must be made by the Grand Jury Supervising Judge after reviewing the Government's application and any response the foreign authorities chose to make. The plain language of the statute is clear and we must adhere to it. *United States v. One "Piper" Aztec ... Aircraft,* 321 F.3d 355, 359 (3d Cir.2003) (" 'Our task is to give effect to the will of Congress, and where its will has been expressed in reasonably plain terms, the language must ordinarily be regarded as conclusive.' ") (quoting *Negonsott v. Samuels,* 507 U.S. 99, 104, 113 S.Ct. 1119, 122 L.Ed.2d 457 (1993)).[11]

Congress knew how to use the past tense. It used the past tense twice in § 3292 when referring to the findings that the Grand Jury Supervising Judge must make: first to state the requirement that "an official request has been made" for foreign evidence (a requirement not in dispute in the present case), and second to state the requirement that "it reasonably appears, or reasonably appeared at the time the request was made, that such evidence is, or was in such foreign country."

■ Our interpretation of § 3292(a)(1) not only accords with the plain language of the statute, but is also clearly supported by the legislative history. The House Report accompanying the statute contains the following explanation:

> Subsection (a)(1) of new section 3292 authorizes a Federal court, upon application of a Federal prosecutor that it made before the return of an indictment and that indicates that evidence of an offense is located in a foreign country, to suspend the running of the applicable statute of limitation. If the court finds by a preponderance of the evidence that (1) an official request has been made for the evidence and (2) it appears (*or reasonably appeared at the time the official request was made*) that the evidence is (*or was*) in that country, the court must order such suspension.

H.R.Rep. No. 98–907, at 7 (1984), *reprinted in* 1984 U.S.C.C.A.N. 3578, 3584 (emphasis added). The use of parenthesis in the second sentence of the above quotation demonstrates that the "or was" language in the statute refers only to the finding that the Grand Jury Supervising Judge must make, i.e., that evidence was in a foreign country "at the time the official request was made." *Id.*[12]

---

**11.** While we agree with the Government that use of the term "indicat[e]" manifests a legislative intent that the Government's application need make only a minimal showing, *see Rowland v. Cal. Men's Colony,* 506 U.S. 194, 200, 113 S.Ct. 716, 121 L.Ed.2d 656 (1993) (stating that term " 'indicates' certainly imposes less of a burden than ... 'requires' or 'necessitates' "), this minimal showing --- that evidence "is in" a foreign country at the time the Government files its application for suspension to the district court—must nonetheless be made.

**12.** We note that the "is, or was" language in § 3292(a)(1) is not superfluous. It provides for the possibility that the foreign authorities may provide the requested evidence before the Grand Jury Supervising Judge issues an order suspending the statute of limitations. *See* 18 U.S.C. § 3292(a)(2) (providing thirty days for grand jury judge to render final order on Government's application). In other words, by the time the Grand Jury Supervising Judge is ready to rule on the Government's application, it may be that a preponderance of evidence shows that foreign evidence "was" in

The Government argues that it needs additional time to sift through and examine the foreign evidence. There is no provision in the statute giving the Government extra time. To the contrary, 18 U.S.C. § 3292(b) is explicit in providing that the "period of suspension ... end on the date on which the foreign court or authority takes final action on the request." 18 U.S.C. § 3292(b). The legislative history confirms that Congress was concerned only with the prejudice the Government suffers when it must obtain foreign evidence; it was not concerned with the delays attendant to sifting through such evidence.[13] The Government prosecutors have, in each case, as long to review the evidence, consider its ramifications, and persuade the grand jury to indict, if appropriate, as was left on the statute of limitations when the suspension began.

Congress has balanced the Government's need to obtain evidence from abroad, and the delays this may entail, against the defendant's interest in repose if charges are not brought with reasonable promptness. *See Toussie v. United States,* 397 U.S. 112, 115, 90 S.Ct. 858, 25 L.Ed.2d 156 (1970) ("[c]riminal limitations statutes are to be liberally interpreted in favor of repose.") (internal quotations and citations omitted); *United States v. Levine,* 658 F.2d 113, 119 (3d Cir.1981); *United States v. DiSantillo,* 615 F.2d 128, 134 (3d Cir. 1980).

Although the United States Court of Appeals for the Ninth Circuit has interpreted § 3292 differently than we do, *see United States v. Miller,* 830 F.2d 1073, 1076 (9th Cir.1987) (stating that "[t]he statute makes better sense if it is read ... to let the government file the application after it has sifted the foreign evidence sought"); *see also United States v. De-George,* 380 F.3d 1203, 1213 (9th Cir.2004), we are not persuaded by its analysis. The *Miller* court included only a one paragraph explanation stating that:

The statute itself specifies the only relevant time the application must be made:

a foreign country at the time the Government made its request to the foreign authorities, even though evidence "is" no longer in that country, as "final action" has already been taken by the foreign authorities. The Government is still entitled to an order suspending the statute of limitations, even after the requested foreign evidence has been produced, but only if the Government's application for suspension was filed before the foreign evidence was produced.

**13.** Under "Purpose," the House Report states in full:

The purpose of the legislation is to make foreign-kept business records more readily admissible into evidence in criminal trials in United States courts and to extend statute of limitation [sic] and Speedy Trial Act deadlines when evidence located in foreign countries *must be obtained.*

H.R.Rep. No. 98–907, at 2 (1984), *reprinted in* 1984 U.S.C.C.A.N. 3578, 3578 (emphasis added). In the discussion of "Background and Need for the Legislation," the House Report continues:

The procedures that must be undertaken in other countries *in order to obtain the records* generally take a considerable period of time to complete.... The delays attendant in obtaining the records from other countries create both statute of limitations and Speedy Trial Act problems. If the records are essential to the bringing of charges, the delay in getting the records might prevent filing an information or returning an indictment within the time period specified by the relevant statute of limitation.

H.R.Rep. No. 98–907, at 2–3 (1984), *reprinted in* 1984 U.S.C.C.A.N. 3578, 3578–79 (emphasis added). Thus, "the bill ... permits a Federal court, upon application of the prosecutor, to suspend the running of the statute of limitations *for such time as is necessary* (up to 3 years) *to obtain evidence from a foreign country ....*" H.R.Rep. No. 98–907, at 4 (1984), *reprinted in* 1984 U.S.C.C.A.N. 3578, 3580 (emphasis added).

"before return of an indictment." . . . The statute then goes on to say that the district court shall grant the application if "it reasonably appears, or reasonably appeared at the time the request was made, that such evidence is, or was, in such foreign country." . . . The "was" here plainly indicates that Congress set no store upon the evidence still being abroad as a precondition for granting the application. Nor would it make sense of the statute to read in such a requirement. The statute makes better sense if it is read . . . to let the government file the application after it has sifted the foreign evidence sought.

*Miller,* 830 F.2d at 1076 (quoting 18 U.S.C. § 3292).

■ The *Miller* opinion fails to recognize that the Government's application for suspension must be made after the Government has made its request for evidence to the foreign authorities. More importantly however, the *Miller* court has completely read out of the statute the requirement that the Government's application for a suspension indicate that the evidence "is" in the foreign country. We need not repeat our prior analysis. Because the proper reading of a statute must take account of words in the context of the entire statute, *Ratzlaf v. United States,* 510 U.S. 135, 141, 114 S.Ct. 655, 126 L.Ed.2d 615 (1994), we decline to follow the Ninth Circuit's approach.

■ The Government argues in the alternative that even if § 3292(a)(1) is construed as we have set forth, its application to the Grand Jury Supervising Judge could nonetheless meet the statutory requirements of the subsection because only copies of requested evidence were provided by foreign authorities and therefore, the original source documents remained in the foreign country. We find this argument unconvincing.

The continued presence of original documents in a foreign country is irrelevant. Section 3292 was passed as part of the Comprehensive Crime Control Act of 1984. One of its several purposes was to make evidence obtained from foreign countries "more readily admissible into evidence in criminal trials in United States Courts." H.R.Rep. No. 98–907, at 2 (1984), *reprinted in* 1984 U.S.C.C.A.N. 3578, 3578. Accordingly, the Act includes provisions that relax hearsay and authentication requirements for foreign evidence, and it provides mechanisms that ease the taking of depositions from foreign witnesses. *See, e.g.,* 18 U.S.C. § 3505;[14] *see also* 18 U.S.C. § 3507 (providing that district court may appoint special master to carry out depositions in foreign country).

Therefore, despite the fact that only copies of requested records were obtained from foreign authorities, nothing prevents the Government from introducing this evi-

---

**14.** That statute provides in pertinent part that:

(a)(1) In a criminal proceeding in a court of the United States, a foreign record of regularly conducted activity, *or a copy of such record,* shall not be excluded as evidence by the hearsay rule if a foreign certification attests that-

(A) such record was made, at or near the time of the occurrence of the matters set forth, by (or from information transmitted by) a person with knowledge of those matters;

(B) such record was kept in the course of a regularly conducted business activity;

(C) the business activity made such a record as a regular practice; and

(D) if such record is not the original, such record is a duplicate of the original;

unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness.

(2) A foreign certification under this section shall authenticate such record or duplicate.

18 U.S.C. § 3505 (emphasis added).

dence at trial. Interpreting § 3292 in the manner advocated by the Government would eviscerate the plain intent of Congress.

## B.

### Equitable Tolling

■■■ The Government, as a fallback to its unpersuasive statutory interpretation argument, argues that because it relied in good faith on the order of the Grand Jury Supervising Judge suspending the statute of limitations, we should apply equitable tolling to save the untimely counts in the indictment. Although we have never foreclosed the possibility that equitable tolling applies to criminal statutes of limitations, *see United States v. Midgley*, 142 F.3d 174, 178 (3d Cir.1998) (observing "that criminal statutes of limitations are subject to tolling, suspension, and waiver"), we may invoke the doctrine "only sparingly," and under very narrow circumstances. *Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89, 96, 111 S.Ct. 453, 112 L.Ed.2d 435 (1990). "Absent a showing of intentional inducement or trickery by the defendant, a statute of limitations should be tolled only in the 'rare situation where equitable tolling is demanded by sound legal principles as well as the interest of justice.'" *Midgley*, 142 F.3d at 179 (quoting *Alvarez–Machain v. United States*, 96 F.3d 1246, 1251 (9th Cir.1996)).

In *Midgley* we rejected the Government's contention that a good faith exception should be made to equitable tolling in the criminal context, stating:

we must not forget that criminal limitation statutes are to be liberally interpreted in favor of repose.... However tempting it may be to create equitable

exceptions to bright line rules ... the very existence of a statute of limitations entails the prospect that wrongdoers will benefit.... Ultimately, the clear and unambiguous rule afforded by the criminal statute of limitations is preferable to a shifting standard based on the perceived equity of the [the particular case].... While Congress and the courts may continue to weigh competing policy interests concerning the administration of justice, the unqualified limitation period of § 3282 reflects a balance that has already been struck.

*Midgley*, 142 F.3d at 180 (internal quotations and citations omitted).

In the present case, Atiyeh did not "induce" the Government's current situation, and principles of justice do not demand that the statute of limitations be tolled under the current circumstances. This court has never applied equitable tolling to rescue a Government indictment filed after the statute of limitations has lapsed, and we see no convincing rationale to do so here.[15]

## C.

### Conclusion

For the above reasons we hold that the District Court erred by denying Atiyeh's pretrial motion to dismiss Counts Three through Six and Nine through Fifteen of the indictment as time-barred.

## III.

### Acquittal of Gambling Offenses

■■■ As noted earlier, the Government filed two cross appeals. One challenges the order of the District Court granting Atiyeh's post-trial motion for judgments of

---

**15.** Given our interpretation of § 3292, it is unnecessary to address Atiyeh's additional argument that the findings of the Grand Jury Supervising Judge were not supported by a preponderance of the evidence before him.

acquittal under Fed.R.Crim.P. 29(c) as to Counts Two, Eight through Fifteen, and Count One (to the extent it was based on a violation of 18 U.S.C. § 1955). Count Eight charged conspiracy to commit money laundering. Counts Nine through Fifteen charged separate money laundering violations under 18 U.S.C. § 1956(a)(2). Under 18 U.S.C. § 1956(a)(2)(A), it is a crime to transfer funds to or from the United States "with the intent to promote the carrying on of a specified unlawful activity," in this case illegal gambling activity in violation of 18 U.S.C. § 1955.

Section 1955 provides, in pertinent part:

(a) Whoever conducts, finances, manages, supervises, directs, or owns all or part of an illegal gambling business [is guilty of this offense].

(b) As used in this section—

(1) "illegal gambling business" means a gambling business which -

(i) is a violation of the law of a State ... in which it is conducted;

(ii) involves five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business; and

(iii) has been or remains in substantially continuous operation for a period in excess of thirty days or has a gross revenue of $2,000 in any single day.

(2) "gambling" includes but is not limited to pool-selling, bookmaking, maintaining slot machines, roulette wheels or dice tables, and conducting lotteries, policy, bolita or number games, or selling chances therein.

Relevant here is the requirement of a finding that the defendant conducted an illegal "gambling business," as defined by state law. The Pennsylvania statute that is the predicate of the § 1955 charge is 18 Pa. Cons.Stat. § 5514. That statute provides:

A person is guilty of a misdemeanor of the first degree if he:

(1) engages in pool selling or bookmaking;

(2) occupies any place for the purpose of receiving, recording or registering bets or wagers, or of selling pools;

(3) receives, records, registers, forwards, or purports or pretends to forward, to another, any bet or wager upon the result of any political nomination, appointment or election, or upon any contest of any nature;

(4) *becomes the custodian or depository, for gain or [re]ward, of any* property staked, wagered or pledged, or to be staked, *wagered, or pledged upon any such result;* or

(5) being the owner, lessee, or occupant of any premises, knowingly permits or suffers the same, to be used or occupied for any such purposes.

18 Pa. Cons.Stat. § 5514 (emphasis added).

In finding Atiyeh guilty on all counts of the indictment, the jury answered a series of interrogatories based on the requirements of the Pennsylvania statute.[16] The

---

16. The relevant interrogatories and jury answers were:

Jury Interrogatories Number Three through Seven—Count Two (Illegal Gambling Business)

3. Do you unanimously agree, by proof beyond a reasonable doubt, that the business was an illegal gambling business because it was engaged in bookmaking?

_____Yes X No

4. Do you unanimously agree, by proof beyond a reasonable doubt, that the business was an illegal gambling business because it occupied 727–51 North Meadow Street, Allentown, Pennsylvania, for the purpose of receiving, recording or registering bets or wagers?

_____Yes X No

jury found that Atiyeh had violated Pennsylvania state gambling law by becoming "a custodian of funds that were wagered or to be wagered," an offense under 18 Pa. Cons.Stat. § 5514(4). At the same time, the jury found that Atiyeh did not violate any other provision of the Pennsylvania gambling statute.

Atiyeh moved for judgment of acquittal which the District Court granted because it concluded that "a conviction under 18 U.S.C. § 1955, predicated on a violation of [18 Pa. Cons.Stat. § 5514], would require a finding that the gambling operation in which the Defendant is involved include[ ] some pool selling or bookmaking conducted in Pennsylvania...." Supp.App. at 13a. According to the District Court, the Pennsylvania legislature expressed no interest in prohibiting the banking of funds inside Pennsylvania which were received, recorded, or registered for gambling purposes outside of Pennsylvania.

### A.

### 18 Pa. Cons.Stat. § 5514

We must decide as a matter of law whether the District Court's construction of 18 Pa. Cons.Stat. § 5514 was correct. This question is subject to plenary review by this court. See United States v. Randolph, 364 F.3d 118, 121 (3d Cir.2004). Because we are interpreting a state statute, we must determine how the Pennsylvania Supreme Court would rule if pre-sented with this case. Repola v. Morbark Indus., Inc., 934 F.2d 483, 489 (3d Cir. 1991); Prudential Prop. & Cas. Ins. Co. v. Pendleton, 858 F.2d 930, 934 (3d Cir.1988).

The parties agree that § 5514(4) has never been authoritatively construed by the Pennsylvania Supreme Court nor any other Pennsylvania court. Yet we do not proceed without some guidance. Several Pennsylvania state courts, including the Pennsylvania Superior Court, have definitively held that the subsections of § 5514 should be read disjunctively. See Commonwealth v. Piperata, 215 Pa.Super. 325, 257 A.2d 277 (1969) (examining predecessor statute of § 5514 and holding that, "the statute ... covers many alternative illegal acts or practices ... in addition to the recording and registering of [bets] and the giving of receipts for bets").[17] Commonwealth v. Frey, 89 Dauph. 1, 1–2 (Pa. Quar.Sess.1968) (discussing precursor statute to § 5514 and noting "[w]hile this section bears the heading of pool-selling and bookmaking, it makes unlawful not only the activities of taking bets or chances but a host of other activities concerned with these acts"); Commonwealth v. Johnson, 51 Lanc.L.R. 333, 67 Pa. D. & C. 588, 589–90 (Pa.Quar.Sess.1949) ("The statutory law of Pennsylvania relating to bookmaking is comprehensive and specific.... [It] is applicable not only to bookmaking where bets are entered in a book or on sheets of paper, but it covers in the alternative

---

5. Do you unanimously agree, by proof beyond a reasonable doubt, that the business was an illegal gambling business based upon becoming a custodian of funds that were wagered or to be wagered?

 _X_ Yes _____No

6. Do you unanimously agree, by proof beyond a reasonable doubt, that the business was an illegal gambling business based upon occupying property and knowingly permitting it to be used for bookmaking, or for receiving, recording or registering bets or wagers, or for the purpose of becoming a custodian of funds that were wagered or to be wagered?

 _____Yes _X_No

Supp.App. at 102–03.

17. There is no substantive difference between 18 Pa. Cons.Stat. § 5514 and its predecessor, 18 Pa. Cons.Stat. § 4607.

many other illegal acts or practices pertaining to bookmaking....").

On its face, § 5514 prohibits five separate and distinct gambling related activities. Each provision is separated by a semicolon, and the word "or" appears between subsections four and five. Thus, each subsection within § 5514 should be given independent effect. "When the words of a statute are clear and free from all ambiguity," its provisions must be read in accordance with their plain meaning and common usage. 1 Pa. Cons.Stat. § 1921(b); *Commonwealth v. Lassiter*, 554 Pa. 586, 722 A.2d 657, 660 (1998).

A determination that the statute should be read disjunctively does not end our inquiry. "When interpreting a statute, the court will not look merely to a particular clause in which general words may be used, but will take in connection with it the whole statute ... and the objects and policy of the law, as indicated by its various provisions...." *Kokoszka v. Belford*, 417 U.S. 642, 650, 94 S.Ct. 2431, 41 L.Ed.2d 374 (1974) (internal quotations and citation omitted); *see also Hernandez v. Kalinowski*, 146 F.3d 196, 200 (3d Cir.1988).

Atiyeh argues that several of the separate subsections of § 5514 explicitly require that illegal pool selling or bookmaking activity occur within the state of Pennsylvania. The District Court accepted that argument, noting that § 5514(1) "must refer to bookmaking in Pennsylvania, since the Pennsylvania legislature would not presume to prohibit such activity outside its borders." Supp.App. at 11a. The Court continued that likewise, § 5514(2)'s prohibition on "occup[ying] any place for the purpose of receiving, recording or registering bets or wagers ..." and § 5514(5)'s prohibition on "being the owner, lessee, or occupant of any premises ... to be used or occupied for any of such purposes" must refer to places and

premises within Pennsylvania where pool selling or bookmaking activity occur. Supp.App. at 11a–13a (citing 18 Pa. Cons. Stat § 5514).

Atiyeh further contends that many of the individual subsections in the statute cannot be properly understood when read in isolation. Section 5514(4), for instance, makes it a crime in Pennsylvania to "become[ ] the custodian or depository, for gain or [re]ward, of any property staked, wagered or pledged ... upon *any such result*," 18 Pa. Cons.Stat. § 5514(4); the term "such result" necessarily refers to "the result of any political nomination, appointment or election, or upon any contest of any nature" as described in § 5514(3).

Accordingly, Atiyeh argues that the District Court's construction of § 5514(4) is supported by an examination of the statute as a whole, and the implications drawn therein. We do not agree. None of the subsections attempt to govern extra-territorial activity, and there is no reason to construe subsection (4) to do so. Section 5514(4) merely proscribes "becom[ing] the custodian or depository" of wagered funds, or funds to be wagered, when such custodianship takes place inside the Commonwealth of Pennsylvania, action the jury found Atiyeh committed. *See* 18 Pa. Cons. Stat. § 102. Furthermore, we see no support for the contention that § 5514(4) must be read to require some pool selling or bookmaking in the state of Pennsylvania. The internal reference in subsection (4) to subsection (3) cannot be construed so expansively to include the separate and independent offenses outlined in subsection (1) and (2). Even if there are internal references in the subsections to each other, the fact that the jury convicted Atiyeh of subsection (4) and not of subsection (1) (proscribing pool selling or bookmaking) is irrelevant. His conviction of subsection (4)

is independent of the activities proscribed by the other subsections.

 It was not unreasonable for the Pennsylvania legislature to proscribe the custodianship in the state of Pennsylvania of gambling-related funds, even if the actual pool selling or bookmaking attendant to such custodianship occurred outside the state. In *United States v. $ 734,578.82 in United States Currency*, 286 F.3d 641 (3d Cir.2002), we affirmed the Government's civil forfeiture pursuant to 18 U.S.C. § 1955(d) of proceeds from an international gambling business held by a New Jersey company on the ground that the New Jersey statute proscribing conduct which materially aids any form of gambling activity had been violated. We so held notwithstanding that all betting involved took place in England where it was legal and the New Jersey corporation, whose funds were forfeited, merely acted as an intermediary to the English gambling house.

In *United States v. Truesdale*, 152 F.3d 443 (5th Cir.1998), defendants operated a sports-wagering business, where bets were accepted in the Caribbean but the majority of the financial transactions took place in Texas. Although the Court of Appeals overturned the conviction under 18 U.S.C. § 1955 because the Government had failed to prove that the defendant had engaged in bookmaking in the State of Texas, the court noted that it would have sustained the conviction had the Government charged the defendant with violating the subsection of the Texas statute that prohibited an individual from becoming a custodian of anything of value bet or offered to be bet. 152 F.3d at 449.

We recognize that both the New Jersey state statute in *$ 734,578.82 in United States Currency*, and the Texas statute in *Truesdale* include the term "promoting gambling" in their respective titles whereas 18 Pa. Cons.Stat. § 5514 is merely entitled "Pool selling and bookmaking." However, the Supreme Court has stated that "the title of a statute ... cannot limit the plain meaning of the text. For interpretive purposes, [the title] is of use only when it sheds light on some ambiguous word or phrase." *Pa. Dep't. of Corr. v. Yeskey*, 524 U.S. 206, 212, 118 S.Ct. 1952, 141 L.Ed.2d 215 (1998) (internal quotation and citations omitted).

Because we find no ambiguity in the text of the statute, and because the Pennsylvania legislature was proscribing activity clearly within the scope of its legislative authority, we hold that the District Court's interpretation of § 5514 was erroneous.

**B.**

*Atiyeh's arguments in the Alternative*

 Atiyeh makes a number of additional alternative arguments. First, he contends that the Government failed to establish that the alleged "illegal gambling business ... involve[d] five or more persons who conduct[ed], finance[d], manage[d], supervise[d], direct[ed], or own[ed] all or part of such business," as required by 18 U.S.C. § 1955(b)(1)(ii). The District Court did not reach this argument.

The jury based its finding that IC was a gambling business because it was the custodian of gambling related funds. *See* 18 Pa. Cons.Stat. § 5514(4). Therefore, Atiyeh contends, the Government had the burden of proving that five or more persons conducted the custodial aspect of the business. We do not agree.

 The jury found that Atiyeh, acting through IC, operated an illegal gambling business. Therefore the relevant inquiry was whether IC, as an entity, involved five or more persons who conducted, financed, managed, supervised, or directed all or parts of the business—not whether there

were five of more persons associated with the custodial aspect of the business. The statutory concept of "conducting" is very broad. It "proscribes any degree of participation in an illegal gambling business, except participation as a mere bettor." *Sanabria v. United States*, 437 U.S. 54, 70 n. 26, 98 S.Ct. 2170, 57 L.Ed.2d 43 (1978) (citing, *inter alia, United States v. Ceraso*, 467 F.2d 653, 656 (3d Cir.1972)). The Government produced ample evidence to support a finding by a rational trier of fact (and Atiyeh does not dispute) that five or more persons were associated with IC, as an entity.

■■■ Atiyeh makes two additional arguments, neither of which was presented to the District Court.[18] First, he contends that he was never paid to act as a custodian of wagered funds, and therefore did not become the custodian of such funds for "gain or [re]ward." 18 Pa. Cons.Stat. § 5514(4). This argument is without merit. A person who owns a bookmaking operation clearly gains or is rewarded by holding property that is staked, wagered, or pledged as part of *that* bookmaking operation. Atiyeh's construction of the statute to exclude the owner of the bookmaking operation from the scope of § 5514(4) is odd, and finds no support in the statutory text.

■■■ Finally, Atiyeh argues that the conduct for which he was convicted, becoming a custodian of funds that were wagered or to be wagered, does not come within the limited definition of what constitutes "gambling" under 18 U.S.C. § 1955(b)(2).[19] This argument is flawed. The relevant definition for our purposes is that of an "illegal gambling business," provided for in 18 U.S.C. § 1955(b)(1), not the definition of "gambling" provided for in § 1955(b)(2). The jury found that Atiyeh violated 18 Pa. Cons.Stat. § 5514(4), and therefore operated an "illegal gambling business" as defined by 18 U.S.C. § 1955(b)(1). We have held that the mere custodianship of gambling-related funds is sufficient to constitute a violation of 18 U.S.C. § 1955, because such custodianship is considered to be "gambling" under state law even though it may not appear to fit within "gambling" as defined in § 1955(b)(2). *See $ 734,578.82 in United States Currency*, 286 F.3d at 660; *see also Truesdale*, 152 F.3d at 446–47.

## C.

### *Conclusion*

For the above reasons we hold that the District Court erred by granting Atiyeh's post-verdict Fed.R.Crim.P. 29(c) motion for acquittal as to Counts Two, Eight through Fifteen, and One (to the extent it charged a conspiracy to violate 18 U.S.C. § 1955).

## IV.

### *Prejudicial Taints*

■■■ In summary, we have concluded that the District Court erred in denying

---

18. We have held that "[w]hile a party may not seek more extensive relief on appeal than it received in district court without filing a cross-appeal, an appellee may proffer alternative arguments to support the district court's decision without filing a cross-appeal." *United States v. Lieberman*, 971 F.2d 989, 996 n. 5 (3d Cir.1992); *see also United States v. American Ry. Express Co.*, 265 U.S. 425, 435–36, 44 S.Ct. 560, 68 L.Ed. 1087 (1924); *New Castle County v. Hartford Accident & Indem. Co.*, 933 F.2d 1162, 1205 (3d Cir.1991).

19. "Gambling" as defined in § 1955(b)(2), "includes but is not limited to pool-selling, bookmaking, maintaining slot machines, roulette wheels or dice tables, and conducting lotteries, policy, bolita or numbers games, or selling chances therein."

Atiyeh's pretrial motion to dismiss Counts Three[20] through Six and Nine through Fifteen as time-barred. However, we have further concluded that the District Court erred by granting Atiyeh's post-verdict Fed.R.Crim.P. 29(c) motion for acquittal as to Counts Two, Eight through Fifteen, and One (to the extent Count One alleged a violation of 18 U.S.C. § 1955) because the jury's answers to the special interrogatories support a finding that Atiyeh violated Pennsylvania's gambling law, the predicate to 18 U.S.C. § 1955. Of course, because Counts Nine through Fifteen were in fact time-barred, the District Court's erroneous Fed.R.Crim.P. 29(c) order pertaining to those counts was harmless. We must therefore consider whether Atiyeh's conviction on the remaining counts should be reinstated.

Atiyeh contends that Counts One, Two, Seven, and Eight, which remain, were tainted because of the erroneous submission of Counts Three through Six and Nine through Fifteen to the jury. He argues that in these circumstances, he is entitled to a new trial on Counts One, Two, Seven, and Eight. We are not persuaded.

 The crucial inquiry, when considering a claim of prejudicial taint, is " 'whether the presence of the [invalidated] count[s] had any spillover effect sufficiently prejudicial to call for reversal' of the remaining counts." *United States v. Murphy*, 323 F.3d 102, 118 (3d Cir.2003) (quoting *United States v. Pelullo*, 14 F.3d 881, 897–98 (3d Cir.1994)).

 In making this inquiry, we must first determine whether any evidence was admitted to support the time-barred counts that would have been inadmissible to support the remaining counts. *Murphy*, 323 F.3d at 118. Only then need we "consider whether the verdict on the remaining count[s] was affected adversely by the evidence that would have been inadmissible at a trial limited to th[ose] count[s]." *United States v. Cross*, 308 F.3d 308, 318 (3d Cir.2002). We must consider whether (1) the charges are "intertwined with each other"; (2) the evidence for the remaining counts is "sufficiently distinct to support the verdict" on these counts; (3) the elimination of the invalid count "significantly changed the strategy of the trial"; and (4) the prosecution used language "of the sort to arouse a jury." *Murphy*, 323 F.3d at 118 (quoting *Pelullo*, 14 F.3d at 898–99).

Atiyeh has pointed to no evidence that was admitted to support Counts Three through Six or Nine through Fifteen that would have been inadmissible to support Counts One, Two, Seven, or Eight. Count Two charged that Atiyeh conducted a gambling business in violation of 18 U.S.C. § 1955 from November 1995 until January 1997. Consequently, evidence of undercover phone calls made by FBI Agent Manna to IC between September 12 and November 29, 1996 (charged as separate offenses in Counts Three through Six) and evidence of specific wire transactions made by Atiyeh between October 25 and November 29, 1996 (charged as separate offenses in Counts Nine through Fifteen), would be

---

**20.** We also note that Count Three of the indictment, which charged a violation of 18 U.S.C. § 1084 (use of wire communications transmitting information concerning bets), was predicated on a September 12, 1996 phone conversation between FBI Agent Manna and an IC operator. The natural expiration date of the count was September 12, 2001, five years after the conversation. *See* 18 U.S.C. § 3282. Because the Government did not submit its application to suspend the statute of limitations until October 5, 2001, more than three weeks after the statute of limitations had run, it conceded at oral argument that Count Three is time-barred.

admissible to support the substantive gambling charge in Count Two. Accordingly, we find no prejudicial taint in the instant case. *Murphy*, 323 F.3d at 118. We therefore reject Atiyeh's argument that a new trial on the remaining counts is necessary.

## V.

### *Conclusion*

For the reasons set forth above, we will reverse the judgment of conviction as to Counts Three through Six. On the other hand, we will direct the District Court to reinstate the jury's verdict on Counts One, Two, Seven, and Eight. We will therefore remand to the District Court for sentencing on the reinstated counts [21] and for further proceedings consistent with this opinion.

---

[21]. The Government also appeals from the order of the District Court granting a two-level downward adjustment for acceptance of responsibility on some of the charges. The Government argues that the District Court abused its discretion in determining, based on his attorney's statements, that Atiyeh would have pled guilty to violating 18 U.S.C. § 1084 had that charge been brought alone. The Government argues that Atiyeh himself never accepted responsibility but went to trial on those counts, presented factual defenses, and even after conviction, failed to voice any acceptance of responsibility. The Government's argument is colorable but may be moot in light of our rulings. We leave the arguments on this issue to the District Court in the first instance.